WELCH v. BARNETT *ct al.*

No. 1797.    Opinion Filed May 14, 1912.

Rehearing Denied June 25, 1912.

(125 Pac. 472.)

1.    COURTS—Appeal to District Court—Trial De Novo. By section 16 of article 7 of the Constitution and section 1982 of Comp. Laws 1909, it is provided that in all cases appealed from the county court to the district court the cause shall be tried de novo upon questions of both law and fact; and when such an appeal is taken, in order that jurisdiction may be conferred upon the district court, a motion for new trial is not required.

2.    COURTS—County Courts—Trial De Novo—"Civil Cause." The term "civil causes," as used in Comp. Laws 1909, sec. 3989, which provides that in the trial of such causes in the county court the pleadings and practice shall be the same as that of the district court, does not include matters arising in the exercise of the probate jurisdiction of the county court. There is a distinction between "civil causes" and cases arising under the probate jurisdiction of the county court under the classification of sections 15 and 16 of article 7 of the Constitution, providing for appeals from the county court to the Supreme Court and to the district court.

3.    WILLS—Undue Influence—Admissibility of Evidence. Upon a contested petition for the probate of a will, where the grounds of contest are that the testator did not possess testamentary capacity, and that he was subjected to undue influence by the beneficiaries of the will, evidence should be admitted tending to show the relations between the beneficiaries and the testator, which resulted in the procurement by them from him of a deed to a portion of his property, which was executed seven or eight months prior to the date of the will, and all the facts and circumstances connected with said deed and the subsequent relations between the parties.

4.    SAME. The beneficiaries of a will executed by a full-blood Indian were two white men, one of whom was a lawyer, who drew the will, and the third was an Indian judge. Evidence was offered tending to show that these same parties were beneficiaries in four other wills made by full-blood Indians, and that this white lawyer prepared these other wills and kept possession of them. This evidence was excluded. Held, on account of the relations between the white race and the Indian race, and of the conditions prevailing in portions of the state, that this evidence should have been submitted for consideration in determining the question of undue influence.

5.    SAME. In trying an issue of undue influence, alleged to have been exerted by the beneficiaries upon the testator in the making

of his will, every fact from which the inference might legitimately be drawn that such influence had or had not been exerted, or, if exerted, that it had or had not been effective, is admissible, provided the time of its exertion is not so remote that no effect can reasonably be attributed to it, and that such evidence tends to show that the effect of the influence was operative upon the mind and will of the testator when he executed the instrument.

(Syllabus by Ames, C.)

*Error from District Court, Hughes County;*
*John Caruthers, Judge.*

Petition by David A. Barnett, James A. Ostrum, and John E. Turner for probate of the will of Bunnie Hawkins, deceased, and Ralph Welch, guardian of Addie Hickory, objects on the ground of undue influence, duress, and fraud. From a judgment in favor of the beneficiaries David A. Barnett, James A. Ostrum, and John E. Turner, Welch brings error. Reversed and remanded.

This action originated in the probate court of Hughes county by the filing of a petition by David A. Barnett, praying for the probate of the will of one Bunnie Hawkins, deceased, and the issuance of letters testamentary to the petitioner, the executor named in said will. The probate of this will was resisted by Ralph P. Welch, guardian of Addie Hickory, a minor, and the only heir of Bunnie Hawkins, plaintiff in error, upon the grounds that the will was not executed in accordance with the requirements of the statute, and that it was executed because of the undue influence, coercion, duress, and fraud practiced upon said Bunnie Hawkins by David A. Barnett, James A. Ostrum, and John E. Turner, the beneficiaries named in the will, and for the further reason that Bunnie Hawkins was not possessed of testamentary capacity at the time of the execution of the will. Upon the issues thus made, a trial was had in the probate court, resulting in a finding that the will, while executed by Bunnie Hawkins, was executed at a time when he did not possess testamentary capacity, and because of the undue influence exerted over him by the beneficiaries, and an order was made denying the probate of the will. From this order the beneficiaries, David A. Barnett, James A. Ostrum, and John E. Turner, appealed to the

district court of Hughes county, where trial was had and judgment rendered in favor of the beneficiaries, who are the defendants in error here. Thereupon Ralph P. Welch, the guardian of Addie Hickory, brings the case to this court by petition in error.

*Lewis C. Lawson* and *James A. Long,* for plaintiff in error.

*J. R. Witty* and *Jno. E. Turner,* for defendants in error.

Opinion by AMES, C. (after stating the facts as above). The first question presented is whether, on appeal from the county court to the district court from an order refusing to probate a will, a motion for new trial in the county court is necessary to confer jurisdiction upon the district court. We think not. In *Apache State Bank v. Daniels,* 32 Okla. 121, 121 Pac. 237, we held that under the provisions of section 16, art. 7, and section 2 of the Schedule, of the Constitution, an appeal lies to the district court in probate matters, as provided by the laws of the territory of Oklahoma. Wilson's Rev. & Ann. St. 1903, sec. 1793; Comp. Laws 1909, sec. 5451. Section 16 of article 7 of the Constitution and section 1982 of Comp. Laws 1909 (Sess. Laws 1907-08, p. 285) provide that, "in all cases appealed from the county court to the district court, the cause shall be tried *de novo* in the district court upon questions of both law and fact." In probate matters the method of taking the appeal to the district court is set out in Comp. Laws 1909, sec. 5455 (St. Okla. 1893, sec. 1487), and it is as follows:

"The appeal must be made:

"1.  By filing a written notice thereof with the judge of the county court, stating the judgment, decree, or order appealed from, or some specific part thereof, and whether the appeal is on a question of law, or of fact, or of both, and, if of law alone, the particular grounds upon which the party intends to rely on his appeal; and,

"2.  By executing and filing within the time limited in the preceding section, such bond as is required in the following sections. It shall not be necessary to notify or summon the appellee or respondent to appear in the district court, but such respondent shall be taken and held to have notice of such appeal in the same

manner as he had notice of the pendency of the proceedings in the county court."

It is apparent that under this section a motion for new trial is not necessary, because the exact manner of taking the appeal is specified, and no motion for new trial is authorized. *Stewart v. Kendrick,* 12 Okla. 512, 73 Pac. 299.

The reason for such a motion is even less under the provision of the Constitution referred to, which provides for trial *de novo* on all questions of both law and fact. As the district court is not a reviewing court under these provisions of the statutes, but is a trial court, the reason for a motion for new trial does not obtain. It is true the district court is an appellate court; but as an appellate court it is required to try the cause *de novo,* and therefore does not review the proceedings in the county court.

It is argued, however, that Comp. Laws 1909, sec. 3989 (Session Laws 1907-08, p. 474, sec. 7), requires a motion for new trial. That statute is as follows:

"For the trial of all criminal cases, now, or hereafter pending, or transferred in or to any county court, and for the trial of all civil causes, now, or hereafter pending in any county court, the pleadings, practice and procedure shall be the same as that of the district court."

Conceding, without deciding, that this statute would require a motion for new trial in cases covered by it, we do not think probate proceedings are included within the term "civil causes," as used in this section. Section 15 of article 7 of the Constitution provides for appeals from the county courts to the Supreme Court; while section 16 of that article provides for appeals to the district court. Those two sections are as follows:

"Appeals and proceedings in error shall be taken from the judgments of the county courts direct to the Supreme Court, in all cases appealed from justices of the peace, and in all criminal cases of which the county court is vested with jurisdiction, and in all civil cases originally brought in the county court, in the same manner and by like proceedings as appeals are taken to the Supreme Court from the judgments of the district court.

"Until otherwise provided by law, in all cases arising under the probate jurisdiction of the county court, appeals may be taken

from the judgments of the county court to the district court of the county in the same manner as is now provided by the laws of the territory of Oklahoma for appeals from probate to the district court, and in all cases appealed from ·the county court to the district court, the cause shall be tried *de novo* in the district court upon questions of both law and fact."

It will be observed that section 15 covers three classes of cases, and authorizes appeals in these three cases to the Supreme Court. They are as follows: First, all cases appealed from justices of the peace; second, all criminal cases of which the county court has jurisdiction; third, all civil cases originally brought in the county court. Section 16, providing for appeals to the district court, only applies to all cases arising under the probate jurisdiction of the county court. It is thus seen that the Constitution draws a distinction between civil and probate matters; and, in construing the statute referred to, we think the term "civil action," as therein used, should be construed as applicable to the classification of such causes contained in section 15 of article 7; and that probate causes, which are distinguished from civil cases by section 16, should be excluded. In addition to this, it is significant that the section referred to (Comp. Laws 1909, sec. 3989) is found in the chapter on Juries and Jurors, and, in all probability, was intended to provide for the trial of jury cases in the county court, and not intended to refer to probate cases.

Having reached the conclusion that there was error in the exclusion of evidence, it will be unnecessary to pass upon the other assignments of error. In order to correctly understand the bearing of the evidence excluded, a brief statement of the facts is necessary. Turner, one of the defendants in error and a beneficiary under the will of Bunnie Hawkins, is a practicing lawyer. Ostrum, another of the beneficiaries, is a white man, and he and Turner are the principal stockholders and are officers in the Wetumka Oil, Mining & Development Company. Barnett, the third beneficiary, is a Creek Indian, and judge of the Creek courts of the Creek Nation. Some time in the summer of 1907, the beneficiaries of this will secured a warranty deed from Bunnie Hawkins, conveying to the Wetumka Oil, Mining & Development Company 160 acres of land. The consideration agreed

upon was $600, of which $10 was paid at the time, and various amounts, aggregating a total of $33.50, were paid up to the time of the execution of the will; $12.50 thereof being paid on the day before the will was made. The will was executed on March 21, 1908, and therefore six or eight months after the deed was executed. At the time Bunnie executed the will, he had consumption, which resulted in his death about a month afterwards. By its terms the will conveyed all his property, both real and personal, to the beneficiaries therein named, and therefore included the debt which they owed him. The will was drawn by Turner in his office.

We think the court erred in excluding evidence of two classes: First, evidence tending to show the relations between the testator and beneficiaries during the summer of 1907, when they procured the deed; and, second, evidence tending to show that these beneficiaries were, to a certain extent, engaged in the business of becoming beneficiaries in wills executed by Indians. The nature of the evidence of the first class which was excluded is disclosed by the following quotations:

"Q. Going back, did you, or Mr. Ostrum, or the Wetumka Oil, Mining & Development Company, execute any note, mortgage, duebill, or contract and give it to Bunnie Hawkins, showing the amount of indebtedness due him for the unpaid purchase price of that land? By Mr. Witty: We object as incompetent, irrelevant, and immaterial. By the Court: Sustained. Q. You said there was about $33 paid on this land. What about the purchase price of that land? By Mr. Witty: We object as incompetent, irrelevant, and immaterial. By the Court: Sustained. By Mr. Long: Q. What was done about it, about securing it? By Mr. Witty: Objected to for the same reason. By the Court: Sustained. By Mr. Long: I offer to show that the purchase price was not paid, except $33.50, and that there was no security given to the alleged testator for the payment of the purchase price. By the Court: I have sustained that. By Mr. Long: Exception, please. * * * Q. Did you ever see Bunnie Hawkins and John E. Turner and D. A. Barnett and J. A. Ostrum together? By Mr. Turner: Objected to as incompetent, irrelevant, and immaterial. By the Court: Sustained. By Mr. Long: Exception, please. By Mr. Turner: We will admit we were together several times. By Mr. Long: I offer to show by this witness that he was present— By Mr. Turner: I object to the

statement; the question shows itself. By the Court: Sustained. By Mr. Long: Q. What were they doing? By Mr. Turner: We object, for the reason that it is incompetent, irrelevant, and immaterial, unless it is about this transaction. By the Court: Sustained. By Mr. Long: Q. What were they doing at any time prior or after the making of this will? By Mr. Turner: We object as immaterial. By the Court: Sustained. By Mr. Long: Exception, please. We offer to prove by this witness that on a certain night during June or July, 1907, this witness was present in a pasture where they had Bunnie Hawkins, and where they entertained a large number of Indians till after midnight, and that on the next morning they secured deeds to several hundred acres of land, including 160 acres from Bunnie Hawkins, for which they did not pay the full value, or anything like five per cent. of the value; of the property; that this transaction was again repeated by the beneficiaries named in this will, or alleged will, on the night of the 8th of August, and August 9, 1907. By Mr. Witty: We move to strike the offer from the record. By the Court: No; let it stay in; but I will sustain the objection. By Mr. Witty: We except. By Mr. Long: I except to the ruling of the court."

Two of the objections to the probate of the will were that Bunnie Hawkins was not of testamentary capacity, and that the beneficiaries had exercised undue influence. We think this testimony should have been received by the court and considered in its bearing upon both these issues.

The evidence of the second class which was excluded by the court is disclosed by the following quotation from the testimony of Turner:

"By Mr. Long: Q. Is it not a fact that you have now in your possession four other wills made by full-blood Indians to you that you drew in your office, bequeathing to you their allotments and inherited lands, after you had bought their inherited lands and only paid a small price, a small part of the purchase price, in which Turner, Ostrum, and Barnett are beneficiaries? By Mr. Witty: We object as incompetent, irrelevant, and immaterial. By the Court: Sustained. By Mr. Long: Exception, please. Q. Mr. Turner, have you not now in this court a case pending, wherein you and Barnett and Ostrum are the beneficiaries named by full-blood Indians, in which you drew the will, and which has been contested? By Mr. Witty: We object as

not the best evidence, incompetent, irrelevant, and immaterial. By the Court: It is clearly incompetent."

When we bear in mind the relation of these beneficiaries to the testator, and the peculiar facts and circumstances of this case, we believe this evidence should have been considered. If white men are engaged in the business of becoming the beneficiaries of the wills of full-blood Indians, that is a circumstance which, it seems to us, is proper for consideration in ascertaining whether or not they have exerted undue influence upon any particular one of these Indians. The white man belongs to a different race. The Indians in this state, by virtue of the distribution of their tribal property, are all property owners. Many of them are the owners of valuable property. The full-bloods, as a general rule, are known to be peculiarly subject to the loss of their property at the hands of designing and unscrupulous white men. The courts should be astute to furnish them protection, and every legitimate rule of law should be most liberally applied in their interest.

It is not natural that one white man should be the beneficiary of the wills of five full-blood Indians. It is not natural that after full-blood Indians have sold to one white man their inherited lands for a mere fraction of their value they should be under such heavy obligations to him that they would then voluntarily walk into his office and ask him to draw wills for them, creating him the sole heir of all of their allotments, as well as their inherited lands. This is particularly true when it appears that there is doubt in the minds of the white man about the legal right of these full-blood Indians to sell their inherited lands. One cannot help suspecting that these wills have something to do with perfecting the title which the white man has purchased for a nominal consideration. Evidence tending to show a series of transactions of this kind strongly leads us toward the conclusion that the wills resulted from the same influence which induced the Indians to make the deeds for a wholly inadequate consideration; and, if the admissibility of this evidence can be reconciled with established principles of law, it should certainly be admitted.

In the first volume of Wigmore on Evidence, paragraphs 300 to 383, the author discusses at length the admissibility of evidence tending to establish other offenses or similar acts, for the purpose of showing knowledge, design, intent, habit, status, or course of business. In section 302, he says:

"Without formulating any accurate test, and without attempting by numerous instances to secure absolute certainty of inference, the mind applies this rough and instinctive process of reasoning, namely, that an unusual and abnormal element might, perhaps, be present in one instance; but the oftener similar instances occur with similar results, the less likely is the abnormal element likely to be the true explanation of them. Thus, if A., while hunting with B., hears the bullet from B.'s gun whistling past his head, he is willing to accept B.'s bad aim or B.'s accidental tripping as a conceivable explanation; but if shortly afterwards the same thing happens again, and if on the third occasion A. receives B.'s bullet in his body, the immediate inference (*i. e.,* as a probability, perhaps not a certainty) is that B. shot at A. deliberately; because the chances of an inadvertent shooting on three successive, similar occasions are extremely small; or, to put it in another way, because inadvertence or accident is only an abnormal or occasional explanation for the discharge of a gun at a given object, and therefore the recurrence of a similar result (*i. e.,* discharge towards the same object, A.) excludes the fair possibility of such an abnormal cause, and points out the cause as probably a more natural and usual one, *i. e.,* a deliberate discharge at A. In short, similar results do not usually occur through abnormal causes; and the recurrence of a similar result (here in the shape of an unlawful act) tends (increasingly with each instance) to negative accident or inadvertence or self-defense or good faith or other innocent mental state, and tends to establish (provisionally, at least, though not certainly) the presence of the normal, *i. e.,* criminal, intent accompanying such an act; and the force of each additional instance will vary in each kind of offense according to the probability that the act could be repeated, within a limited time and under given circumstances, with an innocent intent. The general canon of logical inference already examined (*ante,* sections 31, 32) is here applied and illustrated."

In the same section the author quotes the following from the opinion of Grove, J., in *Blake v. Assurance Co.,* L. R. 4 C. P. D. 94, 98:

"When the question is whether an act was or was not fraudulent, acts of a similar kind are given as evidence to show intention. I remember in a housebreaking case in which I was counsel, a man was found, under suspicious circumstances, in a bedroom. It was set up that he was there courting the servant. To show a guilty intention, Earle, C. J., admitted evidence of the fact that he was seen in a house a week before under circumstances equally suspicious, and which rebutted the idea that he was there for the purpose of courting. * * * To take the common instance of fraud committed by means of begging letters: If a single letter to one individual only were proved, the evidence would probably be insufficient for a conviction; but the particular transaction is shown to be a guilty one by proving that the person charged has done the same thing twenty times before, and that in each case he has told false stories and given fictitious names. Then is there any rule of law to exclude this evidence? I am of opinion that there is not. Where the act itself does not *per se* show its nature, the law permits other acts to be given in evidence, for the purpose of showing the nature of the particular act, as, for instance, in cases of uttering counterfeit coin, even in some cases of murder, and generally whenever it is necessary to show the intent with which the act was done. * * * (So in this case) if you show similar shams, carried out under the same false name, and that the defendants are the people who put the money in their pocket in each case, the difficulty arising from any possibility of mistake in the case is removed; and the jury may reasonably be called upon to infer that the defendants intended to pocket the money of the plaintiff in the particular case."

He also quotes the following from the opinion of Judge Taft, in *Penn M. L. Ins. Co. v. M. L. B. & T. Co.,* 72 Fed. 422, 19 C. C. A. 295, 38 L. R. A. 33, 70:

"It is a well-established rule of evidence that, where the issue is the fraud or innocence of one in doing an act having the effect to mislead another, it is relevant to show other similar acts of the same person having the same effect to mislead, at or about the same time, or connected with the same general subject-matter. The legal relevancy of such evidence is based on logical principles. It certainly diminishes the possibility that an innocent mistake was made in an untrue and misleading statement to show similar but different misleading statements of the same person about the same matter, because it is less probable

that one would make innocent mistakes of a false and misleading character in repeated instances than in one instance."

The author concludes this paragraph, at page 394, with the following:

"It is just this requirement of similarity which leaves so much room for difference of opinion, and accounts for the bewildering variances of rulings in the different jurisdictions, and even in the same jurisdiction and in cases of the same offense. Some judges incline to treat the judicial test of probative value as identical with the common-sense test, and to admit such instances as bear a similarity liberally interpreted by the standard of everyday reasoning. Other judges set their faces firmly against every instance which is not on all fours with the offense in issue, regardless of the consideration that justice consists quite as much in protecting the public against evil doers as in showing mercy to those whose guilt has been more or less skillfully concealed. It is hopeless to attempt to reconcile the precedents under the various heads; for too much depends on the tendency of the court in dealing with flexible principle. One court will be certain to exclude everything that is not too clearly probative for even technical quibblers to oppose, and sometimes will exclude even that. Another court will accept whatever has real probative value. Something, however, may perhaps be gained by realizing, as to the former, that it is not the law, nor precedent, nor principle, nor policy, that will account for such rulings, but merely a rooted inclination to take the stricter view and a preference to err in favor of criminals and against innocent victims."

In Jones on Evidence (2d Ed.) sec. 143, it is said:

"In criminal cases the conduct of the prisoner on other occasions is sometimes relevant, where such conduct has no other connection with the charge under inquiry than that it tends to throw light on what were his motives and intentions in doing the act complained of. Thus, on trials for uttering counterfeit bills or coin and forged instruments, it has long been the practice to admit evidence of the uttering of similar counterfeit money or forgeries to other persons about the same time; for, while in a single case the uttering of counterfeit money might be perfectly consistent with innocence, the probabilities of guilty knowledge rapidly increase on proof of a continued dealing in the unlawful money. On an accusation for receiving stolen property, knowing it to have been stolen, evidence that the accused has frequently received similar articles under like circumstances from the same thief, and stolen from the same person or place, know-

ing that they were stolen, is relevant to show guilty knowledge. The same rule has been applied in actions for conspiracy; for example, where the proof tended to show that the accused and a deputy collector had conspired to defraud the revenue by entering goods at an undervaluation, evidence of other transactions in furtherance of the common enterprise was held relevant. On the same principle in trials for embezzlement, other previous acts of the defendant of a similar character, so intimately connected with the one under investigation as to show common criminal intent, are relevant."

These same rules are stated with much fullness in Wigmore on Evidence in the sections cited; and at section 370 that author says that the same rules apply in civil as in criminal cases. If evidence of similar transactions is admissible on a trial for uttering counterfeit bills, if evidence of similar transactions is admissible on a charge of receiving stolen property, if evidence of similar transactions is admissible on a trial for conspiracy, if evidence of similar transactions is admissible to determine the fraudulent nature of the transfer of property (Wigmore on Evidence, sec. 333), then we hold that under the facts and circumstances of this case evidence of similar transactions may be considered as bearing upon the intent of these beneficiaries to commit a fraud against the testator and his heirs.

At section 333 Wigmore says:

"Here the question is whether the transfer was made with intent to defraud the transferrer's creditors by deceiving, delaying, or hindering them. The act of transfer is conceded; no specific question as to knowledge (except of insolvency) usually arises (*ante,* section 301); and the inquiry is simply as to the intent accompanying the act. On the intent theory (*ante,* section 302), other transfers of property may have some bearing on this question by tending to negative the probability of good faith. They will have such a probative value whenever they are made under such circumstances that they cannot be naturally accounted for by the ordinary course of business in which such matters occur, from time to time, with good faith. The difficulty is to determine what circumstances are essential to produce this improbability that the transfer was in that ordinary course of business which involves good faith. (1) The quantity of property conveyed will have great weight, as where all the debtor's estate is conveyed; but this is not an essential. (2) The persons

to whom the transfers are made will have weight, because ordinary transfers are naturally made to various persons, and a multiplicity of transfers to the same person is hardly to be accounted for by good faith. Moreover, the family or friendly relationship of the transferee may strengthen the improbability. But it is not essential that the transferee should be the same person in each case, or should be intimately related. (3) The time of the other transfers has much weight; for in the ordinary course of business a large proportion of the entire property may be casually sold from time to time, but not repeatedly within a short time. But the time is chiefly important so far as the other transfers occur during the period when the transferror is insolvent, because the singularity of such transfers at that time is less accountable by the ordinary course of business than at any other time. It is usually said that the other transfers offered must have occurred during a time of insolvency, actual or impending; but this should hardly be required as a rule. Subsequent, as well as prior, transfers equally avail to negative good faith. (4) The consideration is material; for a voluntary transfer at such a time is singularly inconsistent with the probability of good faith. On the whole, then, while several sorts of circumstances are significant, their weight may vary in each case, and no one of them is essential, except that of time, and here no fixed rule can be laid down."

The evidence offered and rejected tended to show that these beneficiaries were buying the inherited lands of at least five full-blood Indians; that they were paying for these inherited lands an insignificant proportion of their real value—about five per cent.; that they were doubtful about the title which they were acquiring; that these Indians, in addition to their inherited lands, also had allotted lands; that under these circumstances these full-blood Indians voluntarily appeared in the office of one of the beneficiaries, the lawyer, and asked him to write wills, devising and bequeathing to him and his associates all of their property, real and personal, thus disinheriting their lawful heirs and substituting these beneficiaries, two of whom were of a different race, and none of whom were in any way related. The situation is so repugnant to the natural course of events, and to the natural sentiments of humanity, as to almost justify its condemnation as against public policy; and we believe these facts should be considered in determining the right and justice of the case. Indeed,

the policy of this state with reference to this subject was expressed by the Legislature of 1909 in an act which took effect on June 11th of that year, providing " * * * that no person who is prevented by law from alienating, conveying or incumbering real property while living shall be allowed to bequeath same by will." Comp. Laws 1909, sec. 8892.

An extensive note upon undue influence as affecting the validity of wills is found in 31 Am. St. Rep., extending from page 670 to page 691. The author of this note, at page 670 of 31 Am. St. Rep., says:

· "That undue influence exercised over a testator will invalidate a will executed by him as ·the result of its domination is everywhere conceded; and it is therefore of the utmost importance that some test be formulated, by the application of which to established ·facts a correct conclusion may be reached as to whether or not a will is incurably tainted by this vice. We must, however, confess at the outset that such a test has not been, and cannot be, prescribed, and that each case must be left to be decided in the light of its attendant circumstances. *Elkinton v. Brick*, 44 N. J. Eq. 154 [15 Atl. 391, 1 L. R. A. 161]; *Waddington v. Buzby*, 45 N. J. Eq. 173 [16 Atl. 690], 14 Am. St. Rep. 706; *Hartman v. Strickler*, 82 Va. 225. It is not the means employed, so much as the effect produced, which must be considered in determining whether undue influence has contributed to the making of a will; for, no matter what means have been employed for influencing the judgment or overcoming the will of the testator, yet, if he was able to resist them, and, notwithstanding their existence, to make a disposition of his property according to his own desires, that disposition must stand, because the influences were unavailing. Though, on the other hand, the influence exerted over the testator was such as, if applied under ordinary circumstances, or exercised over persons of ordinary powers of resistance, would be regarded as innocent, yet, if, in the particular case, it resulted in a disposition of property contrary to the testator's desire, the influence was undue. *Leverett's Heirs v. Carlisle*, 19 Ala. 80."

At page 683 of 31 Am. St. Rep., the author quotes the following from *Lyons v. Campbell*, 88 Ala. 462, 7 South. 250:

"While the mere fact that a will is written by a party who takes a benefit under it does not invalidate it, yet, if·the benefit is large, and especially if the beneficiary is a stranger to the testator's blood, the instrument will be scrutinized·with suspicion,

and clear proof that the testator knew its contents will be required to admit it to probate. Proof of testamentary capacity and of formal execution was insufficient. Because of its accuracy and guarded limitations, we quote the statement of the rule made by Baron Parke: 'If a party writes or prepares a will, under which he takes benefit, that is a circumstance which ought generally to excite the suspicion of the court, and calls upon it to be vigilant and jealous in examining the evidence in support of the instrument, in favor of which it ought not to pronounce, unless the suspicion is removed, and it is judicially satisfied that the paper propounded does express the true will of the deceased. *Barry v. Butlin,* 1 Curt. 637.' Evidence in the shape of instructions for the preparation of the will, or reading or hearing it read, is the most satisfactory, but not the only precise, species of evidence of the testator's knowledge of the will (circumstantial evidence may be sufficient); but the party claiming under the will, whatever mode of proof he may adopt, must satisfactorily establish that the testator knew the contents; *onus probandi* is on him."

With reference to the admissibility of evidence, at page 686 of 31 Am. St. Rep., the author says:

"It is not possible to specify or describe all the evidence which may properly be received, either to prove or disprove the existence of undue influence. Of course, every fact from which the inference might legitimately be drawn that such influence had or had not been exerted, or, if exerted, that it had or had not been effective, is admissible, provided the time of its exertion is not so remote, either from the making of the will, or from the death of the testator, that no effect can reasonably be attributed to it. On the one hand, it may be conceded that it is not essential that the influence be employed at the time of the execution of the will; and, on the other, that it must continue to be operative upon the mind and will of the testator when he executed his last testament, no matter when it was first exercised. *In re Shaw's Will,* 11 Phila. [Pa.] 51; *Davis v. Calvert,* 5 Gill & J. [Md.] 269, 25 Am. Dec. 282; *Hartman v. Strickler,* 82 Va. 225; *Taylor v. Wilburn,* 20 Mo. 306, 64 Am. Dec. 186. In other words, if any fraud, coercion, misrepresentation, or other means of undue influence are exercised over the testator, it is not necessary to prove that they were so exercised at the time the will was executed, but the probability of their being effective or influential must ordinarily diminish with the lapse of time; and the time may be so remote as to justify the exclusion of the evidence."

We have no doubt but that the conclusion we have announced regarding the admissibility of the evidence of the relations between these beneficiaries and the testator in the summer of 1907, and from thence continuously up to the execution of the will, is correct. We confess, however, that the admissibility of the evidence tending to show that these beneficiaries were in the habit, and possibly in the business, of becoming the beneficiaries of the wills of other full-blood Indians may be an extension of the well-settled rules of evidence. But, if so, we believe it is justified by the facts surrounding this particular class of cases, on account of the unusual conditions obtaining in certain parts of this state; and we do not wish to lay down this rule as applicable generally to all cases, but only to those falling within the reason of the rule.

The right of a full-blood Creek Indian to make a will is not questioned in this case.

On account of the rulings on the evidence herein referred to, we think the case should be reversed and remanded for a new trial.

By the Court: It is so ordered.