## In re PALMER'S WILL.

No. 4284.

District Court, E. D. Oklahoma.

June 28, 1935.

302

W. E. Utterback, of Durant, Okl., and E. Moore, of Coalgate, Okl., for W. C. Burge's estate.

Denver N. Davison, of Ada, Okl., for Wilson and Elias Palmer.

D. D. Brunson, of Ada, Okl., for Watson Palmer.

C. A. Summers and C. W. Miller, both of Muskogee, Okl., for United States.

WILLIAMS, District Judge.

W. C. Burge, as petitioner, on December 23, 1930, filed a petition in the county court of Coal ·county, Okl., with an alleged will of Hicks Palmer, as testator, attached, praying that same be admitted to probate and letters testamentary issued thereon to him, due notice as provided by law having been given all parties having interest in said matter. The Journal Entry recites: "This cause came on to be heard on special setting this 10th day of February, 1931, same being a regular probate day of the County Court of Coal County, Oklahoma. The petitioner appeared in person and by attorneys, E. Moore and Denver N. Davison. * * *"

Said Hicks Palmer, a full-blood· Choctaw Indian, duly enrolled upon the final approved rolls of said tribe opposite Roll No. 11518, died in Coal county, state of Oklahoma, December 21, 1930, leaving surviving neither wife or issue or descendants, nor father or mother, and no brothers or sisters or their descendants surviving, other than one full brother, Watson Palmer, a full-blood Choctaw Indian, enrolled on the final approved rolls of the Five Civilized Tribes opposite Roll No. 11517, his next of kin and sole and only heir, and upon his death the said Watson Palmer inheriting all of the estate of the said Hicks Palmer, consisting of a, restricted allotment and other restricted lands and restricted funds in the hands of the superintendent for the Five Civilized Tribes, unless the alleged will offered for probate supersedes such inheritance. The proponent, W. C. Burge, one of the principal beneficiaries, is named therein not only as executor, but also designated therein as trustee of a large part of the estate devised to two other parties. Notice having been given as required by law to all parties concerned, the said Watson Palmer filed his contest and protest to the admission of said will to probate, and, upon a hearing of same in the county court of Coal county, on February 10, 1931, same was admitted to probate. Thereafter, the said contestant or protestant, Watson Palmer, duly prosecuted an appeal from said action of the county court to the district court of Coal county, Okl., where, under the laws of Oklahoma, said appeal would be tried de novo, and such case be of purely equitable cognizance. In re Wak-kon-tah-he-um-pah's Estate, 109 Okl. 126, 129, 234 P. 210, and Welch v. Barnett, 34 Okl. 166, 125 P. 472. Afterwards, upon notice, as required by law, the United States government, as guardian of its Indian ward in such matter, through its proper representative, by virtue of an Act of Congress of April 12, 1926 (44 Stat. 239), appeared and became a party thereto, and in due course, by virtue of section 3 thereof, caused said proceeding to be removed from the district court of Coal county, Okl., to the United States

District Court for the Eastern District of Oklahoma.

Section 3, Act of said Congress approved April 12, 1926 (44 Stat. 239, 240), in part provides: "Any one or more of the parties to a suit in the United States courts in the State of Oklahoma or in the State courts of Oklahoma to which a restricted member of the Five Civilized Tribes in Oklahoma, or the restricted heirs or grantees of such Indian are parties, as plaintiff, defendant, or intervenor, and claiming or entitled to claim title to or an interest in lands allotted to a citizen of the Five Civilized Tribes or the proceeds, issues, rents, and profits derived from the same, may serve written notice of the pendency of such suit upon the Superintendent for the Five Civilized Tribes, and the United States may appear in said cause within twenty days thereafter, or within such extended time as the trial court in its discretion may permit, and after such appearance or the expiration of said twenty days or any extension thereof the proceedings and judgment in said cause shall bind the United States and the parties thereto to the same extent as though no Indian land or question were involved."

The said full brother, Watson Palmer, full-blood Choctaw, and restricted heir of such Indian (Hicks Palmer), claiming title to said restricted lands allotted to such restricted Indian (Hicks Palmer) and the restricted proceeds, issues, rents, and profits derived from the same and such other restricted lands, caused to be served a written notice of such pendency in the said district court of such contest as to the probating of such will upon the superintendent to the Five Civilized Tribes, and within twenty days thereafter and such extended time as the trial court in its discretion permitted, the United States intervened and had such matter removed to this court. Motion to remand was overruled on July 18, 1933.

The valid execution of said will would operate as an alienation. Taylor v. Parker, 235 U. S. 42, 35 S. Ct. 22, 59 L. Ed. 121; Id., 33 Okl. 199, 126 P. 573; Hayes v. Barringer (C. C. A.) 168 F. 221; Id., 7 Ind. Terr. 697, 104 S. W. 937. The probating of said will involved the title to or interest in the restricted allotment and such other restricted lands of a restricted Indian and to the restricted proceeds, issues, rents, and profits derived therefrom belonging to a restricted Indian of the Five Civilized Tribes in Oklahoma.

Prior to said Act of April 12, 1926, no provision of law authorized the making of the United States a party to a suit to quiet title or determine questions as to such restricted lands of the Five Civilized Tribes. In actions prosecuted to final decree or judgment as to such matter in a state court without the United States of America as a party thereto, its right thereafter to maintain a suit to enforce such restriction was not affected. In Sunderland v. U. S., 266 U. S. 226, 45 S. Ct. 64, 69 L. Ed. 259, it was held: "The United States is not bound by a decree of a state court, to which it was not a party, quieting title to restricted Indian land against the Indian in favor of his attempted grantee, but may have both the conveyance and the decree set aside by suit in the federal court." See to the same effect Privett v. U. S., 256 U. S. 201, 41 S. Ct. 455, 65 L. Ed. 889, and United States v. Smith (C. C. A. 8) 288 F. 356. The conclusive finality of a judgment or decree of a state or federal court without the United States as a party thereto, involving the title to the restricted lands and allotment of such restricted Indian, had been a matter of much controversy. See Vinson v. Graham (C. C. A.) 44 F.(2d) 772; Stewart v. Keyes, 167 Okl. 531, 30 P.(2d) 875; Id., 55 S. Ct. 807, 79 L. Ed. 1507. The question as to the conclusiveness of the judgment or decree in such matters ultimately led to the enactment by the Congress of the United States of the said Act of April 12, 1926, chapter 115 (44 Stat. 239), providing for the United States government to be made a party so that it could be concluded thereby. Restrictions under section 1, Act May 27, 1908 (35 Stat. 312), as limited or qualified by section 9 thereof (35 Stat. 315), were extended by section 1 of said Act of April 12, 1926 (44 Stat. 239), so as to cover conveyances by such full bloods as to interest in certain allotted lands acquired not only by inheritance but also *by devise.*

The jurisdiction of this court in this case appears to be not only within the purpose but also within the letter of said Act of April 12, 1926 (44 Stat. 239), entitled, "An Act To Amend section 9 of the Act of May 27, 1908," which had

the effect of enlarging the jurisdiction of the United States District Courts within the bounds of the Five Civilized Tribes in cases in which the title to such restricted Indian lands and funds had become involved, and a restricted member of the Five Civilized Tribes in Oklahoma or restricted heir of such Indian is a party thereto, claiming or entitled to claim title to or an interest therein.

In United States v. Mid-Continent Petroleum Corporation (C. C. A.) 67 F.(2d) 37, 42, decided on September 1, 1933, it is said: "The Hosey-Guthrie Group contend that the case was improperly removed, and that the Federal court is without jurisdiction. They assert that on the death of Ullie Eagle the land in question ceased to be restricted, and therefore that no restricted member of the Five Civilized Tribes in Oklahoma, or restricted heir or grantee of such Indian was party as 'plaintiff, defendant, or intervener * * * claiming * * * title to or an interest in lands allotted to a citizen of the Five Civilized Tribes.' It was alleged in the notice and in the petition for removal that a large number of persons who were either parties defendant or interveners were restricted members of the Five Civilized Tribes and claimed some right, title, and interest in such land. This allegation is not challenged either by pleading or proof. At the time of the filing of the petition for removal, Lizzie Tiger née Gambler, and Isla Wolf were parties to the action. The notice and petition for removal alleged that they were restricted members of the Five Civilized Tribes. The proof shows that both were enrolled full-blood citizens of the Creek Tribe. Lands passing to full-blood heirs remain under qualified restrictions by virtue of section 9 of the Act of May 27, 1908 (35 Stat. 312, 315); Parker v. Richard, 250 U. S. 235, 39 S. Ct. 442, 63 L. Ed. 954; United States v. Gypsy Oil Co. (C. C. A. 8) 10 F.(2d) 487; Holmes v. United States (C. C. A. 10) 53 F.(2d) 960. Thus it will be seen that there were parties to the action who were clearly within the class designated in section 3, supra."

It is further said: "The Hosey-Guthrie Group assert that section 3, supra, does not of itself give a Federal court jurisdiction on removal, but that other independent grounds of Federal jurisdiction must exist. Such a construction is contrary to the express terms of section 3, supra, and would make the removal provision thereof superfluous and useless."

In Fish v. Kennamer (C. C. A.) 37 F.(2d) 243, 246, it is said: "It is true the statute does not expressly say that the United States is a party to the cause on its removal to the Federal court; but we see no reason why, considering the purpose of the statute and the intervention of the United States for removal, which was undoubtedly the exercise of its protecting care over the Indians' rights, it should not thereafter participate in the disposal of the whole controversy in its capacity as guardian, and, as said, it was represented by counsel thereafter in the cause."

In determining the question of jurisdiction of this matter, we may consider whether the particular class of cases to which this belongs is within the purpose of the statute in providing for a removal to the national court. Holy Trinity Church v. U. S., 143 U. S. 457, 467, 12 S. Ct. 511, 36 L. Ed. 226; U. S. v. Union Bank of Canada (C. C. A.) 262 F. 91, 8 A. L. R. 1438; U. S. v. Smith (D. C.) 266 F. 740; De Hasque v. Atchison, T. & S. F. R. Co., 68 Okl. 183, 173 P. 73, L. R. A. 1918F, 259.

Whilst an evident intention of this act was in part to afford a speedy and adequate means to quiet such titles, yet it is clear by thereby permitting the United States government to be made a party for such purpose, it was also the intention of Congress that when the United States government was brought in that it should have the privilege of having all essential adjudications made by removal in the national courts. To say that these statutes are to receive such construction that in cases involving succession through wills or inheritance, that as to probating of the wills and determination of heirship, which involve findings of fact as well as determination of questions of law, the state tribunals should have exclusive jurisdiction, in such matters, subject to be reviewed by the state Supreme Court and then by the Supreme Court of the United States, does not appear to be in accord with the purpose or intention of the act. To reserve to the United States government the power and authority to litigate the question of title, after the state tribunals have found and determined all the facts and every question of law

involved in the probating of the will, the judgment of the court admitting the will to probate becoming res judicata and the national court concluded by such proceeding, neither appears to be within the purpose nor letter of the act.

■ Act of March 4, 1931 (46 Stat. 1528 [28 USCA § 901 et seq.]), entitled, "An Act To permit the United States to be made a party defendant in certain cases," by section 3 thereof (28 USCA § 903) providing that "any such suit brought against the United States in any State court may be removed by the United States to the United States district court for the district in which the suit may be pending," and Act Jan. 27, 1933 (47 Stat. 777), entitled, "An Act Relative to restrictions applicable to Indians of the Five Civilized Tribes in Oklahoma," by section 6 thereof (47 Stat. 778) providing that all appropriate proceedings thereunder shall be instituted in federal courts, express an intention and purpose by the Congress of the United States that in all suits, proceedings, or actions to which the United States of America may be made a party, the adjudication thereon, at its election, must be in a national court. In section 1, Act April 12, 1926, fourth proviso (44 Stat. 239), it is provided that the provisions of section 23, Act April 26, 1906 (34 Stat. 145), as amended by this act, are hereby made applicable to all wills executed under this section. Said section 23 provides: "That no will of a full-blood Indian devising real estate shall be valid, if such last will and testament disinherits the parent, wife, spouse, or children of such full-blood Indian, unless acknowledged before and approved by a judge of the United States court for the Indian Territory, or a United States Commissioner." Page 507, Laws relating to Five Civilized Tribes.

Section 8, Act May 27, 1908, p. 544 (35 Stat. 315), provides: "That section twenty-three of an Act entitled 'An Act to provide for the final disposition of the affairs of the Five Civilized Tribes in the Indian Territory, and for other purposes,' approved April twenty-sixth, nineteen hundred and six, is hereby amended by adding at the end of said section, the words 'or a judge of a county court of the State of Oklahoma.'"

Congress in said Act of April 12, 1926, eliminating the authority of the state county judge, who is judge of probate court,

to approve such wills, further indicates the purpose of said act to confine all jurisdiction affecting such matters, as far as practicable, to the federal courts. It is by Act of Congress that wills as to restricted allotments by such restricted Indian allottees are permitted, and this supports the conclusion that it was intended by said Act of April 12, 1926, that such restricted Indian heirs in such matter could cause the United States government to be brought in and that such matter at its election be removed to a national court.

In Ex parte Milligan, 4 Wall. (71 U. S.) 2, 112, 18 L. Ed. 281, it is said:

"But it is argued, that the proceeding does not ripen into a cause, until there are two parties to it. This we deny. It was the cause of Milligan when the petition was presented to the Circuit Court. It would have been the cause of both parties, if the court had issued the writ and brought those who held Milligan in custody before it. Webster defines the word 'cause' thus: 'A suit or action in court; any legal process which a party institutes to obtain his demand, or by which he seeks his right, or supposed right' —and he says, 'this is a legal, scriptural, and popular use of the word, coinciding nearly with case, from cado, and action, from ago, to urge and drive.'

"In any legal sense, action, suit, and cause, are convertible terms. Milligan supposed he had a right to test the validity of his trial and sentence; and the proceeding which he set in operation for that purpose was his 'cause' or 'suit.' It was the only one by which he could recover his liberty. He was powerless to do more; he could neither instruct the judges nor control their action, and should not suffer, because, without fault of his, they were unable to render a judgment. But, the true meaning of the term 'suit' has been given by this court. One of the questions in Weston v. City Council of Charleston [2 Pet. 449, 7 L. Ed. 481], was, whether a writ of prohibition was a suit; and Chief Justice Marshall says: 'The term is certainly a comprehensive one, and is understood to apply to any proceeding in a court of justice by which an individual pursues that remedy which the law affords him.' Certainly, Milligan pursued the only remedy which the law afforded him. * * *

"One of the questions in Holmes v. Jennison et al., 14 Pet. 540 [614, 10 L.

Ed. 579], was, whether under the 25th section of the Judiciary Act a proceeding for a writ of habeas corpus was a 'suit.' Chief Justice Taney held, that, 'if a party is unlawfully imprisoned, the writ of habeas corpus is his appropriate legal remedy. It is his suit in court to recover his liberty.' There was much diversity of opinion on another ground of jurisdiction; but that, in the sense of the 25th section of the Judiciary Act, the proceeding by habeas corpus was a suit, was not controverted by any except Baldwin, Justice, and he thought that 'suit' and 'cause' as used in the section, mean the same thing.

"The court do not say, that a return must be made, and the parties appear and begin to try the case before it is a suit. When the petition is filed and the writ prayed for, it is a suit,—the suit of the party making the application. If it is a suit under the 25th section of the Judiciary Act when the proceedings are begun, it is, by all the analogies of the law, equally a suit under the 6th section of the act of 1802.

"But it is argued, that there must be two parties to the suit, because the point is to be stated upon the request of 'either party or their counsel.'

"Such a literal and technical construction would defeat the very purpose the legislature had in view, which was to enable any party to bring the case here, when the point in controversy is a matter of right and not of discretion; and the words 'either party,' in order to prevent a failure of justice, must be construed as words of *enlargement* (italics mine), and not of restriction."

See, also: Brodhead v. Shoemaker et al. (C. C.) 44 F. 518, 11 L. R. A. 567; Farrell v. O'Brien, 199 U. S. 89, 25 S. Ct. 727, 50 L. Ed. 101; Waterman v. Canal-Louisiana Bank Co., 215 U. S. 33, 30 S. Ct. 10, 54 L. Ed. 80; Federal Procedure, Vol. 1, page 187; Ellis v. Davis, 109 U. S. 485, 486, 3 S. Ct. 327, 27 L. Ed. 1006; Gaines v. Fuentes, 92 U. S. 10, 23 L. Ed. 524; Sutton v. English, 246 U. S. 199, 38 S. Ct. 254, 62 L. Ed. 664.

■ I conclude that the term "suit," as used in the Act of April 12, 1926, embraces this matter, and have proceeded with the trial in this case on the assumption that prior to the Act of April 12, 1926, such suit as here presented was not removable to this court. In re Cilley (C. C.) 58 F. 977; Copeland v. Bruning (C. C.) 72 F. 5; In re McDonald's Estate (D. C.) 42 F.(2d) 266; In re Gray's Estate (C. C. A.) 66 F.(2d) 367; Atwood v. Rhode Island Hospital Trust Co. (C. C. A.) 34 F.(2d) 18; O'Connor v. Slaker (C. C. A.) 22 F.(2d) 147.

■ The removal of this case to this court does not bring here the entire settlement of the estate, or have the effect of taking away from the state probate court settlement of the estate, except as to validity of the execution of the will by a restricted member of the Five Civilized Tribes alienating restricted Indian allotments or restricted Indian lands and restricted rents, income, issues, proceeds, and profits derived therefrom, the parties thereto interested therein being restricted members of the Choctaw Tribe. It will be presumed that the state probate court will respect the adjudication which may be made here as to such matter. Waterman v. Canal-Louisiana Bank Co., supra.

### Statement of Facts.

In executing the will in question, Hicks Palmer was moved thereto by undue influence on the part of the beneficiary, W. C. Burge, in view of the direct and circumstantial evidence establishing the fact that the execution of the will was brought about through the machinations and manipulations of said beneficiary.

Prior to the discovery of oil and gas in the allotment of Hicks Palmer, the association between him and W. C. Burge was occasional and not intimate, but after Palmer had such expectancy and began to receive royalties, the association between the two became more intimate and frequent, and gradually progressive. Prior to the time of his association with W. C. Burge, Hicks Palmer did not indulge in intoxicating liquors, but after such association began he commenced drinking to excess and such indulgence increased progressively. The association between Palmer and Burge became so noticeable that people in the surrounding community reached the conclusion that Burge was Palmer's guardian. Palmer became an habitual drunkard through the influence and association of Burge, resulting in serious physical disabilities. The medical testimony tended to show that ex-

cessive indulgence in intoxicating liquors would tend to weaken the mind and affect the nervous condition of the person so indulging. Burge and Palmer continuously associated together and were generally always seen in each other's company. After Palmer left the hospital where he had gone for treatment for certain physical ailments, he went to the home of Burge and lived with him and his family, all of whom were of the White race and not of Indian blood.

No transactions with reference to Palmer's property took place and no improvements were made thereon without Burge's approval. There was evidence tending to show that Burge had made certain statements that Palmer was going to keep on drinking, and that "if he was going to die, the sooner the better," that he had a will from Palmer, and that Burge, after being told that he should be afraid to give liquor to Palmer, replied, "Well, he is worth more to me dead than alive."

The proof showed that W. C. Burge was a man over average intelligence and shrewdness and that Hicks Palmer was an Indian of average intelligence and address.

In 1916, Palmer, at the age of seventeen years, married his first wife, who was Rosa Bean, and who died in 1926 and who was a restricted member of the Five Civilized Tribes. At the time of the execution of the will, Hicks Palmer owned his restricted homestead and surplus allotments, gas being developed in 1919 and oil in 1921. On the 16th day of April, 1930, there was on deposit to his credit in the office of the superintendent for the Five Civilized Tribes $23,359.22, the date the will was executed, on December 21, 1930, the date of his death, there remained on deposit in said office to his credit $20,618.75; and on the date of the trial of this case, there was on deposit to the credit of his estate the sum of $26,977.21, all of said funds derived from the sale of oil and gas produced from his restricted allotment. There was purchased by the government out of the restricted funds of said Hicks Palmer for him, on or about the 1st day of December, 1925, 670 acres of land located and situated in Coal county, known as the Clara B. Cook lands, the consideration paid therefor being $16,750, said lands being restricted under the conditions of the deed and not subject to alienation

until April 26, 1931. He also owned by inheritance at the time of his death a one-third interest in 140 acres of land known as the Micy Cobb land, which was restricted. He also received by devise from his first wife, Rosa Bean, a Chickasaw, 100 acres of land, her homestead, restricted; and he owned by inheritance a fourth interest in 160 acres of land in Pontotoc county, known as the Felin Bean allotment, which was a restricted homestead with a newborn heir thereto. He left also personalty, such as household and kitchen furniture.

Under said will, W. C. Burge was devised $10,000 in cash and 670 acres of land, known as the Cook property. Watson Palmer, a restricted Choctaw Indian, was to receive $1,000, and the balance of his estate to go to his two nephews, Wilson Palmer and Elias Palmer, fullblood restricted Indians and sons of Watson Palmer. W. C. Burge was named not only executor, but also trustee for the said nephews, Wilson Palmer and Elias Palmer, for all of their legacy. W. C. Burge left as his sole and only heirs at law his wife, Lillie E. Burge, his sons, William Burge and Reuben Burge, and a daughter, Ida Love, the said Lillie E. Burge being now the duly qualified and acting administrator of his estate. Patsy Greenan is the duly qualified and acting guardian of Elias Palmer. F. S. Sorrells, administrator de bonis non of the estate of Hicks Palmer, appointed by the county court of Coal county, was made a party hereto, and so were Elias Palmer, by his guardian, Patsy Greenan, and Wilson Palmer. All parties in interest are parties hereto and represented by attorneys.

At the hospital on September 8, 1930, in a talk with C. E. Creager, Hicks Palmer appeared to understand the provisions of the will, but when Mrs. Rosa Spring, the field agent, and the probate attorney interrogated him, he did not appear to understand such provisions, and when they returned with the will and it was read over to him, he still did not appear to understand it. There is nothing to show in this record that Creager talked to him before these two visits by Mrs. Spring. After September 8th and after he had left the hospital, Creager had him, Hicks Palmer, to meet him at the office of Patsy Greenan in Coalgate, some time in October. W. C. Burge and his wife were

present, evidently accompanying him to said place. He then appeared to understand the contents of the will. This does not indicate that the will was not executed under the controlling and undue influence of W. C. Burge. Mrs. W. C. Burge, in her testimony, admitted that Hicks drank intoxicating liquors and kept it around her home.

Anthia Trivitt, the second wife of Hicks Palmer, who married him December 16, 1928, and lived with him for eleven months and then was divorced, testified as to facts showing he was. dominated, controlled, and influenced by Burge and drank intoxicants to an excess with him. The proof shows that he was so completely dominated, controlled, and influenced by Burge that people dealing with him and coming in contact with them considered that Burge was his guardian, when in fact he was not. Watson Palmer had been Hicks Palmer's guardian, and probably during such period held a restraining influence over him, as the evidence discloses prior to the time he came under the influence of Burge he was sober and did not dissipate by indulging in intoxicants. The fact that Burge may have bought or advanced a few minor things for him and his first wife in 1916 would be nothing unusual. Both of them had allotments and his wife had inherited lands, which were nontaxable and which must have produced some income. There is no evidence here to show Watson Palmer was neither a good Indian nor unfaithful to Hicks Palmer as his guardian. These two young Indians, the nephews, testified before me and they appeared to be likable Indians. They had been to various Indian schools and made a good appearance. I am satisfied if Hicks Palmer had been left to his own inclination, he would have provided for these two young men in his will, and also more liberally for Watson Palmer. He told Mrs. Spring that he wanted to leave his property to his own blood. But under this will he left the best agricultural land he had, to wit, the Cook place, to Burge, and set aside $10,000 in cash for him at a period when the oil business was at low ebb.

When Burge came to the scrivener to draw the will and immediately took him in a car out to his house to draw same, the only other person there, other than Hicks Palmer, was Mrs. W. C. Burge. When the scrivener asked him about witnesses, this Indian named Patsy Greenan and J. M. Covington, the former a real estate man and the latter a merchant in Coalgate. I cannot believe that he would have intentionally named these two men in a town seven or eight miles away when there were neighbors nearby and a physician. attending him, had not Burge told him it would take witnesses and suggested these two men. There was great haste in its preparation. Burge had the scrivener on the road back to his place within thirty minutes after he reached Coalgate. He did not evince as much interest in getting Dr. Bates speedily out there to administer treatment for him in his desperate illness. When the scrivener took the two witnesses out to witness the will, he states: "I read the will over to Hicks slowly and carefully." Then he was asked by the court: "Where was he when you read it to him? A. He was still in bed. And I asked him if that was his will. He said it was. Then I told him—he hesitated—and I told him it would be necessary that he request witnesses, so he requested Mr. Greenan and Mr. Covington as witnesses." These two witnesses had been brought out there that morning by the scrivener obtained by W. C. Burge, a principal beneficiary. He then testified: "I think Mr. Covington held him up and Mr. Greenan held a book and placed his will on that and he signed." Everything that took place was under the direction or motivation of some one else, no initiative on the part of that full-blood Indian that was sick nigh unto death, and who thereby practically disinherited his only living blood brother and closest relative, and there is no evidence that there was ever any estrangement between them. The statement is that Hicks Palmer thought that his brother Watson would not take care of an inheritance or legacy. Watson could not have dissipated the estate any more than Hicks Palmer had under the influence and espionage of W. C. Burge.

It was shown that a total amount of $109,214.27 was paid out for his use and benefit out of the funds derived from the oil and gas to his credit in the hands of the superintendent for the Five Civilized Tribes, which amount did not include the $16,750 paid for the Cook place, or the contribution to the Presbyterian College to be used for the education of

Indian girls. The inventory did not show that Palmer, at the time of his death, possessed any cattle or personal property other than household and kitchen furniture.

Palmer died on December 21, 1930, and on December 23, 1930, W. C. Burge filed petition for probate of the will dated April 16, 1930. The petition alleged that testator left an estate consisting of real and personal property in the county consisting of 1,200 acres of land situated in Coal, Carter, Love, and Pontotoc counties in Oklahoma, of the reasonable value of $15,000, when the record disclosed that the superintendent for the Five Civilized Tribes had paid in cash $16,750 for 670 acres of it, the balance comprising his allotment from which the oil and gas was derived, and the allotment and inherited lands of his first wife. Other property set out was $20,000 in cash in the hands of the Indian department, and other personal property in the sum of $1,000, a total sum of $36,000.

### Conclusions of Law.

The Congress of the United States, in recognition of the undermining effect of intoxicating liquors upon the Indian race, passed laws making it a felony to introduce intoxicating liquors into the Indian Territory, or to barter, sell, or give same to restricted Indians. In Act June 16, 1906 (34 Stat. 267), to enable the people of Oklahoma and Indian Territories to form a Constitution and be admitted into the Union, is contained a mandate that there shall be incorporated in said Constitution a provision that it shall be unlawful for a period of twenty-one years from the date of the admission of said state into the Union, and thereafter until the people of said state shall otherwise provide by amendment of said Constitution and proper legislation, to manufacture, sell, barter, give away, or otherwise furnish intoxicating liquor within that part of the state known as Indian Territory and the Osage Reservation, and within any other parts of said state which existed as Indian Reservations on the 1st day of January, 1906. Section 13, article 7, of the Oklahoma State Constitution provides that the county court shall "appoint guardians of * * * common drunkards; * * * transact all business appertaining to the estates of * * * common drunkards. * * *"

Section 805, vol. 1, Oklahoma Statutes 1931, provides that an habitual drunkard is incompetent to sit as a juror, and section 3447 that any officer not subject to impeachment, elected or appointed to any state, county, township, city, town, or other office may be removed from office on account of being an habitual drunkard. Section 1, article 8, of the State Constitution, provides that all elective state officers created by the Constitution shall be liable and subject to impeachment for habitual drunkenness. It is further made a crime for any person to give any habitual drunkard any spirituous, vinous, fermented, or malt liquors, or any imitation thereof, or any liquors or compounds of any kind or description whatsoever, medicated or not, which contains as much as one-half of 1 per centum of alcohol, measured by volume, and which is capable of being used as a beverage. Section 2658, Oklahoma Statutes 1931, provides that any habitual drunkard may be treated at the expense of the county in an institute for medical treatment for drunkenness. "Drunkard" is defined as: "A drunkard, as mentioned in the foregoing sections of this chapter, shall be deemed to include any person who has acquired the habit of using spirituous, malt or fermented liquors, cocaine or other narcotics, to such an extent or degree as to deprive him of reasonable self-control." See section 2661, O. S. 1931.

In Kendall, Adm'r, et al. v. Ewert, 259 U. S. 139, 42 S. Ct. 444, 447, 66 L. Ed. 862, Redeagle, a full-blood restricted Indian, having become an habitual drunkard, which fact Ewert knew and for that reason declined to talk business with him while he was drinking, advised Redeagle by letter to come to his office sober, and not to come while he was drinking, and that he would pay him $700 when he signed a stipulation for dismissal of a suit which at that time was pending in the United States Circuit Court of Appeals, 264 F. 1021, wherein Ewert was appellant and Redeagle appellee. Redeagle went to said office sober and not drinking when Ewert was out of the state, and Ewert's clerk, after Redeagle signed the stipulation, paid him the $700. This stipulation was attacked as being void. A number of witnesses were heard, several of whom testified that Redeagle had some education and that he had been drinking heavily for many years and become so incapac-

itated for the transacting of business that they refused to have any business relations with him. Others testified that when sober he was competent to do business. The Indian agent testified, among other things, that he did not think Redeagle mentally weak, but that he was a drunkard; he, like all drunkards, was not fit to do business when drunk; that when he · was sober he knew what he was doing, but he had been drinking a number of years and it was injuring him; that he was improvident, and stated he did not think just because he was a drunkard he ought to be protected. The witnesses differed as to whether or not Redeagle had deteriorated to the point of being incompetent to do business when sober. The Supreme Court of the United States said:

"Without further discussion of the evidence, it is sufficient to say that, while the witnesses differ as to whether Redeagle had deteriorated to the point of being incompetent to do business when temporarily sober, they all agree, and the District Judge agrees with them, that, long before the stipulation for dismissal was signed, he had come to be generally regarded, as a common, a habitual, drunkard, and we think the Circuit Court of Appeals failed to give the weight to this fact which it deserves.

"That habitual drunkards are not competent to properly transact business is so widely recognized in the law that in many states statutes provide for placing them under a guardian or committee, with authority to put restraint upon them and to preserve their property, not less than for themselves than for those dependent upon them. A typical statute makes— 'All laws relating to guardians for lunatics, idiots and imbeciles, and their wards * * * applicable' to guardians for drunkards. General Code Ohio, § 11011.

"The extent to which one must have fallen below the standard of ordinary business capacity before he will be generally recognized in a community as a common drunkard is so notorious that we do not hesitate to say that *evidence of competency entirely clear* should be required to sustain a transaction in which such a person has plainly, as in this case, been overreached by a person dealing with him who is *competent* and *aggressive*. Men so reduced will sacrifice their prop-erty, as they have sacrificed themselves, to the craving for strong drink, and Ewert's letters show that he knew perfectly well that the Indian with whom he was dealing had reached that unfortunate stage of decay. They show him refusing to have business dealings with Redeagle three days before the paper was signed, because he had been drinking, but that at the same time he was eager to obtain from him a stipulation to dismiss the case, if only he could secure it under circumstances such that he could make plausible proof that he was temporarily sober."

Paragraphs 3, 4, and 5 of the syllabus are as follows:

"3. The inference of incapacity for business arising from the fact that a man is generally regarded in his community as a common drunkard can only be overcome by clear evidence of his ability on the particular occasion, when a transaction in which he was plainly overreached is in question.

"4. Held, upon the evidence, that a stipulation to dismiss this suit, and a quitclaim deed, both affecting valuable property rights of an Indian, were executed by him when incompetent, due to his addiction to drink, and should be set aside.

"5. An Indian's deed of his restricted allotment which is invalid because of his mental incompetency when he made it is not validated by its subsequent approval by the Assistant Secretary of the Interior, presumably given without knowledge of the Indian's condition when the deed was executed."

See, also, McCarty v. Weatherly, 85 Okl. 123, 204 P. 632; Welch v. Barnett, 34 Okl. 166, 173, 125 P. 472; Zeigler v. Coffin, 219 Ala. 586, 123 So. 22, 63 A. L. R. 942, 945; Coghill v. Kennedy, 119 Ala. 641, 24 So. 459; Raney v. Raney, 216 Ala. 30, 112 So. 313.

We have in this proceeding the question of the validity of the execution of a will by a restricted full-blood member of the Five Civilized Tribes in Oklahoma, alienating his restricted allotted and inherited lands and the restricted proceeds, issues, rents, and profits derived therefrom, of all of which he was seized in fee, and as a party thereto, claiming or entitled to claim title to or an interest in said lands and funds, a full-blood brother and only heir (a restrict-

ed member of the Five Civilized Tribes in Oklahoma) of the testator had caused written notice of the pendency of such controversy, matter, and proceeding to be served on the superintendent for the Five Civilized Tribes, and the United States thereafter in proper time appeared and caused the same to be removed to this court. This is a suit as contemplated in the said Act April 12, 1926, as removable to this court.

Having found that this will was executed through the undue influence of W. C. Burge and that intoxicating liquors constituted a part of this undue influence, I conclude that this will should be declared of no effect, in so far as the restricted allotted and inherited lands and the restricted rents, profits, proceeds, issues, and income derived therefrom, claimed by, and to which Watson Palmer, a restricted member of the Five Civilized Tribes in Oklahoma, as an heir, would be entitled, and its probation in that respect denied.