In re WILLIAMS' ESTATE.

WILLIAMS et al. v. GIBSON et al.

No. 34661.   Aug. 5, 1952.

Rehearing Denied Oct. 7, 1952.

*249 P. 2d 94.*

Gomer Smith, Gomer Smith, Jr., Jean P. Day, and William M. Allen, Oklahoma City, and Joe Ralls, Atoka, for plaintiffs in error.

Utterback & Utterback, by Priscilla W. Utterback, Durant, for Harry W. Gibson, Jr., Executor, and Williams Church, Pike County, Ala.

W. L. Steger, Durant, for City of Durant, a Municipal Corporation.

BINGAMAN, J. The sole question presented on this appeal is whether on October 11, 1947, Judge Robert L. Williams was mentally competent to make a will disposing of his property. Judge Williams died on April 10, 1948, and thereafter his will was filed for probate. A petition contesting the will was filed by his two brothers, Thomas M. Williams and Collin C. Williams, and another contest filed by another brother, Boland W. Williams, the two contests being consolidated. Collin C. Williams apparently withdrew from the contest and took no further interest therein, and Boland W. Williams assigned his interest to his two children, James W. Williams, and Julia Derryberry. Thereafter, the contest was conducted by Thomas M. Williams, James W. Williams and Julia Derryberry. The will was admitted to probate by the county court and contestants appealed to the district court where the matter was heard de novo. At the conclusion of the evidence the district court upheld the judgment of the county court approving the will and contestants appeal.

A large number of witnesses were produced by both sides and many exhibits introduced in evidence. Consequently, the record is voluminous, consisting of 1,239 pages of pleadings and evidence and two volumes of exhibits. It is therefore impossible to set out at length the evidence produced by the proponents and contestants of the will. The evidence was conflicting, and we will endeavor to set out in a general way the substance of the evidence produced by both sides.

It is undisputed that at the time of his death Judge Williams was 79 years of age; that he was physically infirm and that he was possessed of a considerable amount of property, including some seven thousand acres of

land, insurance policies, bank stock and a considerable amount of other personal property. By his will he left his property in trust to be used for the upkeep and improvement of a small rural church in Alabama, his native state, founded by his father and known as Williams Chapel, and a public library in the city of Durant, named the Robert L. Williams Library. He left a small bequest to one sister to whom he had theretofore deeded a considerable amount of farm land; left an amount to be used in the preparation of five hundred copies of his biography, which were to be distributed in accordance with the provisions of the will, and left to each of his four brothers. Simeon W. Williams, Boland W. Williams, Thomas M. Williams and Collin C. Williams, the sum of one dollar. While the will is long and somewhat involved, it is clear and coherent and the provisions thereof are plain and understandable. From the record it appears that in 1944, Judge Williams wrote a will, making a similar disposition of his property; that he revised that will, making certain changes therein, in 1946, and that the will of 1947 was a revision of the will previously written in 1946. In each corrected will the bulk of his property was left to the Williams Chapel and the Durant Library and in each of them his brothers were left the sum of one dollar only. At the time of his death Judge Williams was a retired Judge of the Circuit Court of Appeals of the Tenth Circuit, and on various occasions in the five or six years preceding his death, was assigned to hold court both in Oklahoma and in Texas.

Proponents in support of the will produced testimony of a number of prominent citizens of the state, members of the Oklahoma Historical Society, of which Judge Williams was president; a large number of citizens of Durant, certain tenants of Judge Williams, as well as others who came in frequent contact with him, all of whom testified that while he was feeble physically, and prone to talk about by-gone events

in his life and similar subjects, he was in their opinion at all times mentally alert and competent; that he conducted his business intelligently and profitably; that he knew the description and value of the land owned by him; that both before and after the making of the will he actively functioned as president of the Oklahoma Historical Society and as a director in the Durant National Bank; that he visited his farm properties nearly every week, collected rents and had work done on the farms which was necessary or which would increase their value.

The head of the Hospital for the Insane at Vinita, a physician who had been in charge of that institution for some sixteen years and who was familiar with and a student of mental conditions, testified that he frequently came in contact with Judge Williams; that he saw and conversed with him either shortly before or shortly after the execution of the will, and that he had observed his demeanor at various times and that in his opinion Judge Williams was at all times mentally competent. It appears that Judge Williams was in the habit of going to Battle Creek Sanitarium, at Battle Creek, Michigan, for treatment and observation, and his attending physician at that place testified that when Judge Williams was there in August of 1947, he was, in his opinion, mentally alert and competent; that if anything his condition showed some improvement over the years he had previously been treated there. Another physician, a resident of Durant, testified that he and Judge Williams were close personal friends; that he had had occasion to talk to him numerous times and made a trip to Alabama with him in 1940, at which time they went out to Williams Chapel; that the Judge was at all times, in his opinion, mentally competent, knew his property and what he wanted to do with his money. He testified that when he visited Williams Chapel with Judge Williams, in 1940, Judge Williams had already made some improvements in the property and that Judge Williams at

that time stated that he intended putting some money in a trust fund so that the chapel and the graveyard thereof in which many of his ancestors were buried, and another graveyard in the vicinity where the ancestors of the Paul family, to whom he was related, were buried, was also to be improved and preserved. The evidence shows also that since 1924 or 1925, Judge Williams had had in mind the donation of a public library to the city of Durant. All this evidence indicates that the disposition of his property in the will was not the result of mental incompetency, but that it was due to his considered judgment long prior to the time mental incompetency is charged.

In addition to the testimony of these witnesses, a large number of letters written by Judge Williams, reports of the meetings of the Oklahoma Historical Society and other documents prepared by the Judge, were introduced in evidence. Therefrom it appears that in many of these instruments he made corrections and inserted additional provisions in his own handwriting, all of which appear to have been properly made and from which it appears that he knew exactly what he was doing at the time he made them. The abstractor, with whom the Judge transacted his abstract business in Durant, testified that the Judge knew the description of every tract of land owned by him, and the insurance agent who carried his insurance testified that he knew the various pieces of property owned by him and kept them insured where insurance was proper. Both these men testified that as far as their business with the Judge was concerned he was at all times mentally alert and displayed no sign of mental deterioration or incompetence.

The contestants introduced the testimony of Judge Williams' secretary and his brother, Thomas W. Williams, who at the Judge's suggestion established himself in an office adjoining the Judge's in 1939, and assisted the Judge in looking after his property. Both of these witnesses testified that in his later years the Judge was incompetent and incapable of managing his property or business. The secretary testified that while dictating to her he was guilty of much repetition; that he would fall asleep; that he lost or misplaced notes and receipts and that she kept his accounts and wrote his checks, which were signed by him, and that she, together with his brother, Thomas, practically conducted his business during the latter years of his life. Upon examination by counsel for proponents, however, she admitted that the Judge dictated letters and contracts to her; that he made in his own handwriting corrections in the reports of meetings of the Historical Society and other documents; that he visited his farms every week and made various arrangements with his tenants without her assistance. She also testified that early in 1948, prior to his death, she and her brother purchased from Judge Williams one hundred and twenty acres of land; and that at that time she considered the Judge competent to sign the deed and convey the property to them. Her testimony is greatly weakened by the various documents included in evidence showing corrections in matter typewritten by her, including corrections in the description of lands and corrections in the amount of property owned by the Judge, which she had shown inaccurately in financial statements made by him. From these corrections it indisputably appears that the Judge knew what property he owned and where the same was located. This witness also admitted that the Judge made his own deposits at the bank and that he wrote various checks and made various notations thereon, all of which indicated that he was not nearly so dependent upon her and his brother as she testified.

The testimony of Thomas W. Williams was much the same as that of the secretary and was likewise rebutted by the instruments placed in evidence showing intelligent corrections by the Judge. In connection with the testi-

mony of this witness it appears that upcn cross-examination by counsel for proponents he testified that in his judgment, while the Judge was perceptibly weakening mentally and physically from 1942 on, he was not actually incompetent to transact business or to make a will prior to 1945. However, when confronted with the will made by Judge Williams in 1944, in which he and his brothers were left only the sum of one dollar each, he retracted his statement and said that the Judge was incompetent also in 1944.

In addition to these two witnesses proponents produced some of the former tenants, farmers who had farmed portions of Judge Williams' land, in most cases men who had had some difficulty with the Judge, who testified that he was not at himself mentally. One of these witnesses could not read and another did not know the distinction between the meaning of rational and irrational until it was explained to him. They also produced the depositions of certain lawyers in the Fifth Judicial District in Texas, where Judge Williams was designated to hold a term of court in 1946. These witnesses testified that the actions and demeanor of the Judge while on the bench were incomprehensible to them and did not permit them to try their cases properly; that the Judge was forgetful; that he would break in upon the testimony and indulge in long reminiscences of his bygone days, and then reproach them for not proceeding diligently with their cases; that he sometimes went to sleep on the bench and they would have to awaken him. They also testified that after that term of court was held by the Judge they prepared a petition which was presented to the regular judge of that district, requesting him not to have Judge Williams hold court in his district again. In rebuttal proponents produced the judge of that district, Honorable Randolph Bryant, who testified that the only complaints he heard the lawyers make was that Judge Williams jumped on them and was rough with them, and that no such pe-

tition as that testified to by these attorneys was ever presented to him. He testified that in all his conversations with the Judge he noticed no signs of mental incompetency. Other witnesses, including the chief probation officer for that district, testified to frequent interviews with the Judge and to his apparently unimpaired mental ability.

For their medical evidence contestants produced as witnesses two physicians from Oklahoma City, neither of whom knew the Judge personally or had ever observed him at any time. These witnesses testified that from a hypothetical question propounded by counsel for contestants, they were convinced that the Judge was a victim of senile dementia, and that long before he made the will he should have been confined in a mental institution. They testified that in his business relations with his business associates he was able to preserve a shell of his former self so that no one transacting business with him would suspect that he was mentally incompetent, and that the successful conducting of his business in his later years was merely the continuation of a former habit or habits, and that he continued to transact business as he had in the past, not because of his capacity to understand what he was doing, but because he had previously and habitually conducted business in that manner. Their testimony was contradicted by that of the physicians who knew the Judge, including his personal physician at Battle Creek, as pointed out above. In evaluating their testimony in the light of the other evidence produced in the case, we think the language contained in Re Rich's Estate, 79 Cal. App. 2d 22, 179 P. 2d 373-379, is peculiarly applicable. In that case the court said:

" 'The witnesses were skilled alienists, it may be conceded, but the evidence thus adduced of one who has never seen the person, and who bases his opinion upon the facts given in a hypothetical question, is evidence the weakest and most unsatisfactory. Such questions themselves are always

framed with great particularity to meet the views of the side which presents the expert. They always eliminate from consideration the countervailing evidence, which may be of a thousand fold more strength than the evidence upon which the question is based. They are astutely drawn, and drawn for a purpose and that purpose never is the presentation of all the evidence. It is never to present the fair and accurate view, but the purpose always is to frame a question such that the answer will announce a predetermined result. This kind of expert testimony, given under such circumstances, even the testimony of able and disinterested witnesses, as no doubt these were, is in the eye of the law of steadily decreasing value.' Furthermore, there was no showing in the testimony of the psychiatrist that the insanity, with which in his opinion testatrix was afflicted, was of such a character that except for it she would have divided her property in a way other than she actually did. In other words, the testimony of the alienist did not establish the fact that the abnormality of mind which he ascribed to the testatrix had a direct influence on her testamentary act when she executed her holographic will."

While contestants contend that the evidence conclusively establishes that testator was suffering from senile dementia and that that disease rendered him mentally incompetent to make a will, we held in Re Mason's Estate, 185 Okla. 278, 91 P. 2d 657, and again in Re Wheeling's Estate, 198 Okla. 81, 175 P. 2d 317, that the fact that the testator was suffering from senile dementia was not in itself sufficient to invalidate the will. In each of these cases we said:

"To defeat a will on ground that a testator lacked testamentary capacity, it is not sufficient merely to establish that the testator was a victim of some delusion, but the evidence must go further and establish that the will itself was the product of that delusion and that the testator devised his property in a way which, except for that delusion, he would not have done."

And in the last-cited case we further held that the judgment of the trial court on the issue of the testator's mental capacity, in a proceeding to contest a will, would not be disturbed unless it was clearly against the weight of the evidence.

In Re Martin's Estate, 199 Okla. 567, 188 P. 2d 862, we said:

"A person has testamentary capacity when his mind and memory are such that he knows, in a general way, the character and extent of his property, understands his relationship to the objects of his bounty and to those who ought to be in his mind on the occasion of making a will, and comprehends the nature and effect of the testamentary act."

From the record it appears that the testimony produced by the proponents and that produced by the contestants is conflicting, but the testimony of the witnesses produced by proponents is strongly supported by the documentary evidence contained in the record, as it tends to prove that the testator was mentally alert and competent when he was writing the various letters and contracts, and correcting the numerous instruments, which are set forth in the record. So far as the record shows testator had no animosity or ill-feeling against his brothers, but apparently assumed that they were possessed of sufficient property to justify him in disposing of his property in accordance with his own desires.

Contestants also produced certain testimony which we have not specifically referred to herein for the reason that if, as contended by them, it is sufficient to establish that the testator was the victim of a certain delusion, there is nothing in the record to indicate that the will made by him was affected by such delusion. The testator was a member of the Constitutional Convention, a member of the first Supreme Court of this state, Governor of this state, and Judge of the Federal Eastern District of Oklahoma, and

thereafter of the Circuit Court of Appeals for the Tenth Circuit. He was at all times during his lifetime regarded as one of the ablest, if not the ablest, jurist this state has ever produced. A reading of the will shows, in our judgment, that his mind was clear and unimpaired, and that he thereby disposed of his property in accordance with his theretofore expressed desire, while fully aware of the existence of contestants, and their relationship to him.

In the light of our examination of the evidence in the case, and of the rules of law announced in the authorities above cited, we are unwilling to hold that the judgment of the trial court is clearly against the weight of the evidence. In fact, we think it is sustained by the great preponderence thereof.

Affirmed.

HALLEY, V.C.J., and WELCH, GIBSON, DAVISON, JOHNSON, and O'NEAL, JJ., concur.