In re BAKER'S WILL.

No. 34489.    Sept. 30, 1952.

*248 P. 2d 627.*

Glasser & Glasser, Enid, and Anglin, Stevenson & Huser, Holdenville, for contestants, plaintiffs in error.

Dan Mitchell, Enid, and Green & Farmer and Robert J. Woolsey, Tulsa, for defendant in error.

WELCH, J. No complaint was made concerning the form of the will or as to execution and attestation. The contestants charged a lack of testamentary capacity and that undue influence was practiced upon the testator. In this appeal the judgment is challenged as being against the clear weight of the evidence on these issues.

The record reflects that William L. Baker was of the age of eighty at the time the will in controversy was executed on July 5, 1947. He was never married. Born in Pennsylvania in 1866, he came to Oklahoma Territory about the year 1889, where he secured 160 acres of land located near the town of Hennessey in Kingfisher county. In the years that followed he purchased other farm lands until he owned approximaterly 720 acres in one tract in Kingfisher county, including his original homestead. He also acquired a business building in the town of Hennessey and other real estate and personal property interests.

In his adult life he had but brief contacts with any of his relatives, all of whom lived in states distant from Oklahoma. In 1910 he visited with relatives, including brothers. In 1913, at his invitation, a niece from Pennsylvania came to his ranch in Kingfisher county to keep house for him. She remained for eleven months and returned to Pennsylvania. He did not see her thereafter until 1947, and after the will in question had been executed. In 1927 he was visited for a few days by a niece from Ohio. In 1946 this niece made a brief stop at his home during the course of a trip from Ohio to California, and also a brief stop on her return trip from California.

In the period from 1917 to 1935, Mr. Baker lived at the Kingfisher county ranch with a certain farm family, who, in this time, operated the farm on a share crop basis, while he separately engaged in cattle-raising operations. He lived with the family in the ranch house, receiving his board, washing, and room care, but made no contribution to the grocery and household expenses. It was in this time that he added to his original holdings in Kingfisher county. In 1935 the farm family made other arrangements and moved from the ranch.

In 1935 Mr. Baker purchased a farm of 160 acres located near the town of Hunter in Garfield county. He leased these premises to Herman M. Semrad, and in that year took up abode with the Semrad family in the tenant house on the Garfield county farm. He later purchased an 80-acre tract in Garfield county which he also leased to Semrad. He lived with the Semrads under similar arrangements as he had lived with former tenants as regards board, washing, household services, etc. The house occupied by the Semrads and Baker, from 1935 to late in 1947, was a small four room frame house. Baker slept on an iron cot in a shed room

that was also used as the family wash house and as a place for storage of farm tools.

In 1947, Baker and the Semrads, with some concert of thought and action, began and carried out plans to build a new and larger house to be erected on the location of the old house, at Baker's expense. The Semrads apparently acted for Baker in the handling of various details. They procured the plans and specifications to be drawn and had something to do with making arrangements for the building materials and for workmen. Construction was commenced in August, 1947, and completed in December, 1947.

In this time Baker paid material bills and construction costs in excess of $10,-000. In December, 1947, the Semrads and Baker moved into the new house. Baker used a basement room of the new house as sleeping quarters where an iron cot was kept. Mr. Baker died December 25, 1948. Under the terms of the will executed July 5, 1947, he gave the 240 acres of land located in Garfield county to Herman M. Semrad and wife, Lorene Semrad. He gave all the remainder of his estate to his heirs at law in the share and proportion to which they would be entitled under the law.

According to testimony, in the years of Mr. Baker's stay with the Semrads at his Hunter farm, after 1935, a room was kept in readiness for his use at the ranch house on his Hennessey ranch, but he seldom went there.

During these years, as in the past, he had his income tax reports made out by a person at Kingfisher. When he made trips to Kingfisher to see after his income tax affairs he would at times stop at Hennessey with some member of the family of his former tenants with whom he had lived in the early Hennessey ranch days. On one of these occasions, at Hennessey in 1946, he expressed alarm at the loss of some money, and after a search of the surroundings, the money was found in his vest pocket and later in the day he expressed fear that he had lost his bus ticket, but it was found on his person. During the visit he also expressed forgetfulness concerning payees named in canceled checks he was carrying for the purpose of preparing his tax return. On one of these occasions, in January, 1947, in mention of income tax affairs he expressed forgetfulness of whether he had a wheat crop or had received proceeds of a wheat crop.

In 1946, Mr. Baker's niece from Ohio, and her husband, were on their way to California and stopped at the home of Mr. Baker and the Semrads. On that occasion she talked of her former visit with Mr. Baker at the Hennessey ranch in 1927, and of her father, Lafayette Baker, whereupon Mr. Baker stated he was going back home with her. She explained that she and her husband were on their way to California for a few days visit there and would return by way of Oklahoma and pick him up. On the return stop at the Baker-Semrad home Mr. Baker refused to go with her. The niece testified that on these two occasions in 1946 Mr. Baker did not appear to identify her or to understand who she was.

In 1947, a niece who lived in Pennsylvania, and who had kept house for Mr. Baker in 1931, received a letter from former tenants of Mr. Baker with a suggestion therein that his affairs should be looked into by his relatives. In October, 1947, the said niece came to Oklahoma, and on arrival was met by the said former tenants, who lived in Kingfisher county, and with whom she had been in correspondence. Together they went to the home of the Semrads and Mr. Baker in Garfield county, and where a new house was under construction. Two days later the niece and said former tenants and a relative of the former tenants came to see Mr. Baker. These persons testified concerning conversations had with Mr. Baker on these two occasions, and expressed conclusions therefrom that he did not recognize any of them. These former

tenants made other visits to the Baker home and testified that on such an occasion in 1948 he was crying and incoherent and had not recognized them.

A banker of Hennessey, a business acquaintance of Mr. Baker over a long period of years, in late October, 1947, went to Hunter and out to the nearby farm home of the Semrads and Baker to see Mr. Baker. The banker had been consulted by the niece from Pennsylvania and her attorney concerning Mr. Baker's mental ability to handle his affairs. The banker was interested in acquiring the Hennessey business building owned by Mr. Baker. At the farm home the banker talked with Mr. Baker alone for a period of about two hours. There was a discussion about Mr. Baker's real estate, about his age, and about a will. Mr. Baker told the banker he had not written a will and was not going to. In the course of their conversation he told the banker that he had refused to sign a petition against a proposed paving project in the city of Hennessey. After the interview the banker expressed the opinion that Mr. Baker was all right and capable of handling his business affairs. On a basis of later knowledge that Mr. Baker had on July 5, 1947, signed the instrument offered as his will, and after learning the terms of the instrument and of the amounts of the checks he had signed for the building of the new house, the banker expressed an opinion that Mr. Baker did not know what he was doing when he signed the instrument on July 5, 1947.

In August, 1947, a man from Hennessey came to see Mr. Baker about signing a petition in protest of a proposed paving project in Hennessey. Mr. Baker, handed the petition, looked at it, but refused to sign it, stating he didn't know anything about it. He refused to listen to explanations about the paving project, and answered questions about the new house there being built in monosyllables, and refused altogether to answer some of the questions asked by the Hennessey man. In testimony this man expressed the opinion that Mr. Baker on the particular occasion was without understanding of what he was doing and didn't know what he was talking about.

In 1947 a young man from the Hennessey area of Kingfisher county visited Mr. Baker at his home for the purpose of leasing or buying the Hennessey ranch property. He testified that Mr. Baker appeared to know him and they talked of terms of leasing, but without result, and that he at later times, and in 1948, visited Mr. Baker and on those occasions Mr. Baker did not appear to recognize him or understand the nature of his business.

A psychiatrist, called by the contestants, testifying from an hypothesis, gave his opinion that Mr. Baker was without testamentary capacity on July 5, 1947.

The testimony concerning events of July 5, 1947, shows that on the morning of that day Baker and Semrad together went to the office of an attorney at Enid. The attorney was known to both of them. The attorney had in 1943 prepared an agricultural lease for them covering the Garfield county lands owned by Baker. The lease as prepared by the attorney in 1943 and signed by Baker and Semrad was for a five year term and would have expired one year after July, 1947. The attorney had represented Semrad's father and for several years had assisted Semrad with the preparation of his income tax returns.

Upon the arrival of Semrad and Baker at the door of the outer office of the attorney, Semrad at once departed, and Baker entered the office alone. Alone with the attorney in his inner office Baker spoke of the commencement of a new residence building on his farm, and of Semrad's desire to have the lease renewed, and of his agreement thereto, and of Semrad's expected return to the office in purpose of signing a renewal of the lease with him. Baker then requested aid of the attor-

ney, meanwhile, in the writing of a will, expressing a desire that Semrad not know he had executed a will. After a discussion of terms, the attorney prepared an instrument of a substance as requested by Baker. Baker signed the instrument in the presence of the attorney and his stenographer, who had typed the instrument, and a witness who had been called into the office for the purpose of witnessing and signing of the instrument, declared and named as a will. This attesting witness after signing his name to the instrument left the office. Shortly thereafter Semrad came into the office and he and Baker signed a memorandum of agreement to extend the terms of the agricultural lease, as it had been prepared by the attorney. Semrad and Baker then left the attorney's office and went to a doctor's office where Baker was given a physical check-up by the doctor. They then returned to the farm home where later on the same day they were visited by a farm couple.

The scrivener and attesting witnesses each gave testimony of conversation had with Mr. Baker at the time of the transaction of signing and attestation of the instrument, and each expressed an opinion to the effect that Mr. Baker at such time knew what he was doing and was competent to make a will. The doctor expressed a like opinion, basing his opinion on his observation of him during the course of the physical examination on July 5, 1947. The farm couple who visited Mr. Baker in the evening of July 5, 1947, each gave testimony to the effect that they talked with Mr. Baker about thirty minutes on that occasion; that they lived on a farm nearby to the Semrad and Baker home and were frequent visitors in the Semrad home prior and subsequent to July, 1947, and on such occasions usually visited with Mr. Baker, and on all such occasions, including that of July 5, 1947, Mr. Baker appeared to know and understand what he was doing. Other witnesses, one of whom lived across the road from the Baker house,

and all of whom were near farm neighbors of Baker and the Semrads, each gave testimony of visits with Mr. Baker during a period of time prior and subsequent to July 5, 1947. Each expressed an opinion that he at all such times knew and understood what he was talking about and doing. A cashier of a bank located in the nearby town of Hunter, testified that Mr. Baker opened an account at the bank in 1936; that thereafter he saw and talked to him six or seven times each year, at times when he transacted his business in the bank, and at times when he wasn't in the bank; that Mr. Baker discussed what property he owned with him: that he visited with him at his home while the new house was under construction. That he last visited with him on September 10, 1948, when Mr. Baker made a deposit in the bank. The witness expressed an opinion that Mr. Baker knew what property he owned and that there was nothing wrong with his mentality.

The will in proper form and as proven by the attesting witnesses is favored with the presumption of validity in every respect, and the burden was upon the contestants to establish their grounds of contest. Amos et al. v. Fish et al., 193 Okla. 406, 144 P. 2d 967.

Epitomized, the testimony on behalf of contestants shows that during the year preceding execution of the will Mr. Baker on two occasions failed to recognize a niece with whom he had visited 20 years before, and on two separate occasions while visiting with old acquaintances in Kingfisher county he exhibited lapse of memory. In the months that followed after execution of the will, at different times, Mr. Baker was visited at his home by old acquaintances from Kingfisher county, who in each instance sought to engage him in conversation about his property, and in each instance he exhibited lapses of memory, and on more than one of these occasions he appeared to not recognize such visitor or visitors. In this period of time he was shown to have

suffered occasional and brief confining illnesses, but most of this time he was able to be up and about his home premises and would make occasional trips to surrounding towns.

In Amos v. Fish, supra, the following apt rule is stated:

"A testator has a sound mind for testamentary purposes when he can understand and carry in mind, in a general way, the nature and situation of his property and his relation to those who naturally have some claim to his remembrance, and to those in whom, and the things in which, he has been chiefly interested. Mere showing that at times of execution his memory was bad and that he was physically weak, unaided by other evidence, is insufficient to establish lack of testamentary capacity."

As above noted, the witnesses who lived in the Garfield county neighborhood of the Semrad-Baker home and visited with Mr. Baker most often, testified that he at all such times appeared to know and understand what he was doing. It appears in the testimony that in the years he lived with the Semrad family he received such personal care and attention as was pleasing to him, and that in these years he accumulated large sums of money. The evidence reflects that he never had strong feelings, attachment, or felt a strong sense of obligation to his relatives. In the testimony of those with whom he did a banking business it appears that before and after July, 1947, he knew and understood the nature and situation of his property.

The record is voluminous and we do not undertake to set out each item of the testimony. We have set out enough of the details to indicate the foundation and general character of the protest, and to show the general trend of the evidence offered and relied upon by the contestants.

Upon a consideration of all the evidence in the record we cannot say that the judgment of the trial court on the issue testamentary capacity is against the clear weight of the evidence.

The evidence reflects that the Semrads were very closely associated with Mr. Baker in the latter years of his life. No doubt a strong bond of affection existed between them. We find evidence which might support a conclusion that they influenced him in the matter of the building of the new house on his property, or at the least, as to the type and kind of house, but we find no evidence of influence brought to bear on the testamentary act or an exercise of any such influence as destroyed his free agency and procured the will.

Undue influence as will invalidate a will is that which in effect destroys the free agency of the testator at time the instrument is made, and, which, in effect, substitutes the will of another for that of the testator. It is not sufficient that the testator was influenced in the ordinary every-day affairs of life. The affirmative activity on the part of beneficiaries which gives rise to the inference of undue influence must go to the substance of the testamentary act, and in the absence of such procurement, no burden of proof rests upon beneficiary. In re Lillie's Estate, 195 Okla. 597, 159 P. 2d 542.

Contestants in argument concerning undue influence direct attention to the fact that the attorney who drew the will had long known Herman Semrad and was but slightly acquainted with William L. Baker, and suggest that the attorney was acting for Semrad in the preparation of the instrument and will.

The attorney was not a beneficiary under the will as to present a presumption of undue influence, and we find no evidence of his having any influence over Baker such as could be brought to bear on the testamentary act.

We have examined the entire record of the trial proceedings and find that the judgment of the trial court is in all essentials supported by competent evidence, and on the particular issues

of testamentary capacity and undue influence is not against the clear weight of the evidence.

The judgment is affirmed.

ARNOLD, C.J., HALLEY, V.C.J., and CORN, GIBSON, DAVISON, JOHNSON, and BINGAMAN, JJ., concur. O'NEAL, J., dissents.