In re MARTIN'S ESTATE.

HAMMOND v. FRENSLEY et al.

No. 35205.

Supreme Court of Oklahoma.

Sept. 29, 1953.

Jay D. Jones, Duncan, for plaintiff in error.

J. G. Clift, Duncan, for defendants in error.

BLACKBIRD, Justice.

This appeal involves a will contest. The testatrix, Mrs. Estella R. Martin, died February 4, 1945, in Duncan, Oklahoma, at the age of 63 years, leaving her property which consisted mostly of realty, including farm interests, to her sister, Mrs. Berta C. Brooke, and her daughter, Mrs. Johnye Hammond, in proportions of 51% and 49%, respectively. Upon the joint petition of both beneficiaries, Mrs. Martin's will, dated November 8, 1944, was admitted to probate March 13, 1945, and an administrator with the will annexed was thereafter appointed. Within a year thereafter and while administration of the estate was progressing, during the course of which Johnye received various allowances, she was adjudged incompetent. While under this disability, her husband, Clyde Hammond, as her guardian, filed this contest on her behalf, alleging among other things, in substance, that the will admitted to probate was invalid because the testatrix lacked testamentary capacity due to mental illness at the time she executed it; that the will was written by Mrs. Brooke, who, by the practice of fraud and undue influence, procured its ex-

ecution by the testatrix, and that since its admission to probate, an earlier will dated December 16, 1942, had been discovered. Contestant concluded said pleading by praying that the previous court order admitting the allegedly invalid will to probate be set aside and the 1942 "will" be admitted to probate as testatrix' last will and testament. After Mrs. Hammond was restored to competency, she took the place of her husband and former guardian in the proceedings, and after a trial of the contest in the County Court, that court held in her favor. Upon an appeal from said ruling by Mrs. Brooke and a trial de novo in the District Court, that court entered judgment in her favor, reversing the County Court's judgment and upholding and reinstating the will executed in November, 1944, and the county court order admitting it to probate. Mrs. Hammond has appealed from the latter judgment. She and her aunt, Mrs. Brooke, will hereinafter be referred to in their relative positions of "Contestant" and "Proponent."

According to the undisputed facts, Mrs. Martin was in poor health during the latter years of her life, and proponent, who was a public stenographer, resided in her home and assisted in the management of her property.

The contestant, who apparently had been subnormal all of her life, had married a man who drank excessively. Mrs Martin not only lacked confidence in this son-in-law's ability to provide for her daughter, but it also appeared that she affirmatively disliked him. Judging from her conduct and attitude toward her said daughter, as well as her statements to others, she realized contestant's incompetency, lack of judgment, and financial dependence, and had always shouldered the responsibility of providing for her essential financial needs.

Proponent appeared to be a person of financial responsibility and more capable than the deceased in business affairs. She operated a news stand in which she and Mrs. Martin were at one time partners, but about a year before the latter's death, she took over the decedent's interest and also continued her public stenography at a desk at the back of the room occupied by the

news stand. Like Mrs. Martin, proponent apparently also recognized her niece's dependent condition and appreciated her sister's natural desire to take care of her.

The will in question was written by the testator dictating it to proponent, while the latter typed it.

Contestant's position is that under Anderson v. Davis, Okl.Sup., 256 P.2d 1099, 1100, there was a presumption in this case that her aunt, the proponent, unduly influenced the testator in devising a larger proportion of her property to proponent than to contestant, and that the evidence does not sustain proponent's burden of overcoming this presumption. She further contends that the evidence as a whole shows the testatrix lacked testamentary capacity.

In the case cited, this court laid down the rule that:

"When a will is *prepared* by the sole or principal beneficiary, who was the confidential agent, or who occupied a position of confidence or trust, to the testator, the instrument will not be held valid as a will unless it be affirmatively shown (a) that the testator read or knew its contents, and (b) had independent advice with reference thereto." (Emphasis added.)

In that case, this court also followed the rules that where such a beneficiary *actively participated* in the preparation of the will, he must assume the burden of proof that he did not exert undue influence upon the testator when the will is attacked upon that ground. There it was held that where such relationship between the two exists, and the will *is inconsistent with the testator's claims of duty and affection,* slight evidence of such influence is sufficient to invalidate the will.

Assuming, without at this point deciding, that the proponent occupied a position of confidence or trust in relation to the testatrix, we will now examine the evidence to ascertain whether or not this case possesses the other necessary prerequisites for application of these principles. The trial court, in effect, held that it did not, and one of its "Conclusions of Law" was "That the contestant has failed to establish or prove

facts sufficient to sustain the allegations of her Petition." The substance of one of contestant's contentions here is that, in view of the rules above referred to, there was a presumption in this case that the will she attacks was the result of undue influence by proponent and this shifted the burden of proof to proponent requiring her to overcome said presumption by proof that the testatrix read or knew its contents, "and (b) had independent advice with reference thereto." Proponent tacitly admits that the evidence does not establish "(b)" but contends that the rule as a whole has no application to this case.

The complete text of the will in question is in words and figures as follows:

"I, Estella R. Martin hereby give and bequeath my sister Berta C. Brooke 51 percent and my daughter Johnye Louise Martin 49 percent, of all the property, real, personal or mixed, of which I may die, seized or possessed, of wherever situated."

Proponent was the only eye witness to the actual composition and writing of the will and this was related in her testimony as follows:

"Q. Now then, looking at that instrument, Mrs. Brooks, can you tell us who prepared that will? A. Mrs. Martin dictated it and I typed it.

"Q. Now then, what day was it that you typed this will? A. It was one Sunday morning. I can't remember the date. It was one Sunday morning.

"Q. Now then, where were you when you typed this will? A. In Mrs. Martin's house.

"Q. Were you in the bed room? A. Yes, sir.

"Q. Was she in bed then? A. Yes, sir.

"Q. And where—you in relation to Mrs. Martin's bed when you typed the will? A. Well, it is a large room and the bed sets in the middle of the room, between the windows and the desk, kinda on one side, and my back would be toward her taking the dictation.

"Q. When she dictated the will, did you take it down in shorthand? A. Oh, no. I typed it. I put a paper in the typewriter and typed it.

"Q. About how long did it take you to type that will, if you remember? A. I don't know. I used my hand then. I don't suppose it took very long.

\* \* \* \* \* \*

"Q. Now, whose typewriter did you use? A. Mrs. Martin's or Johnye's.

\* \* \* \* \* \*

"Q. Now then, did you and Mrs. Martin have any discussion about this will, how it was to be made or anything? A. No, sir; I didn't discuss it. \* \* \* She understood and I did too. There wasn't anybody deceived.

"Q. Do you know why she made the will as she did? A. I don't know anything \* \* \* I have my ideas about this, why she did that. She had made it so I could stand between Johnye and the world.

"Q. Now then before this, \* \* \* before you typed up this will, had Mrs. Martin asked you anything about calling a lawyer or anything to prepare her will? A. No, sir; she just said she wanted to dictate it and I put a piece of paper in the typewriter and sit down to write, like you would if you wanted to draw up papers."

■ The above quotation is a typical sample of the evidence, which reveals that proponent neither procured the drawing of the will, had any hand in composing it, or anything to say about what went into it. None of the evidence reveals that she had any more to do with the will than being the one who typed it exactly as dictated by the testatrix. Contestant does not contend that proponent's testimony lacks competency as evidence and in view of the fact that it is nowhere contradicted, we consider of little, if any, significance, the facts pointed out by contestant's counsel, that as a public stenographer she has drawn several wills and has used a form book in so doing. She specifically stated that the will in question was not in any form she had ever used

in drawing wills with the aid of a form book, but was written in just the form and wording in which the testator dictated it to her. With reference to her part in the writing of the will, the proof places her in the same relative position as occupied by Mary Barrera with reference to the will of the late Gordon W. ("Pawnee Bill") Lillie. In that case, In Re Lillie's Estate, 195 Okl. 597, 159 P.2d 542, 544, this court said:

"It is not every act that constitutes undue influence but if a beneficiary writes or prepares a will, that fact should inhibit pronouncement of the instrument as testator's will until the court is satisfied from evidence that testator instructed the preparation of the will and knew its contents at the time of its execution. Welch v. Barnett, 34 Okl. 166, 125 P. 472, quoting Lyons v. Campbell, 88 Ala. 462, 7 So. 250. The annotation in 66 A.L.R. 228 states: 'It is the generally accepted view that the mere existence of a confidential relation between testator and a beneficiary under his will does not raise a presumption that the beneficiary has exercised undue influence over the testator, and does not cast upon the beneficiary the burden of proving undue influence. These consequences follow only when the beneficiary has been actively concerned in some way with the preparation or execution of the will.' * * *

"As stated in Re Estate of Llewellyn, 296 Pa. 74, 145 A. 810, 813, 66 A.L.R. 222: 'The active part which gives rise to the presumption must go to the substance of the testamentary act, not to some mere formal matter. In the absence of such procurement, no burden of proof rests on the legatee.' No presumption of undue influence is raised when the activity of the beneficiary in the preparation, drafting, or execution of the will was done at the request of testator. 68 C.J. 760, Note 75(a) and (b).

"The situation as disclosed by the evidence in the case at bar is comparable to that in the case of Councill v. Mayhew, 172 Ala. 295, 55 So. 314, 319, where it was said the beneficiary's secretary's activities are rather in the nature of testator's amanuensis. 'It was her duty in that capacity to write for him whatever he dictated; and in thus merely responding to his commands it cannot be plausibly urged that she was active in procuring the execution of the will.' "

We think the principles applied in the above case are applicable here and that this case may be distinguished in many important particulars from the Anderson case.

 One of these distinguishing factors is that the will, as drawn, is not inconsistent with natural claims upon the testatrix' duty and affection. The beneficiaries were both directly related to her by blood, which was not true of the principal beneficiary, Johnson, in the Anderson case. Here, the proponent had worked for and been associated in business many years with testatrix' husband, who had predeceased her by several years. Before Mr. Martin's death, proponent had lent or advanced the couple money which was never entirely repaid. After his death, testatrix continued to obtain periodic assistance from her. The only regular monthly income Mrs. Martin was shown to have had at the time of her death was a total of $110 from certain rental units in her own home. There was a loan on this property which was being repaid at the rate of $50 or $51 per month. It would thus appear that the decedent had a very meager net income, and proponent testified that at the time of her death she had only $5 or $6 in the bank. Proponent also testified that after the deceased became ill in 1945, the contestant went to an army camp to live with her husband, and there was no one else to care for decedent, so she sold her home and moved into a room in the deceased's home where she could more conveniently look after her. Proponent further testified that when the contestant became ill "after 1947 or 1948" she "put up the money for her expenses" and further indicated she had been giving the family assistance in financial matters extending over a period of thirty or forty years, even to the extent of seeing that contestant was provided with an education.

At one time proponent filed a claim totalling more than $10,000 against the estate for monies and expenses she had advanced the family, but when the administrator of the estate reimbursed her for the testatrix' funeral expenses, she took no further action to collect the rest. It thus seems only natural that in providing for the disposition of her worldly goods, the testatrix would attempt to discharge at least a portion of her substantial obligations to her sister and it seems only logical that in so doing she would, at the same time, attempt to leave it so that the sister, upon whom she and her husband had relied for so many years to aid them in financial difficulties and in the upbringing of their daughter, could continue to use her good business judgment and experience to protect contestant against want and improvidence. On the witness stand, proponent said she interpreted the deceased's will giving her the major undivided interest in all of the property, as making her responsible for the care of Johnye and the property "* * * just like I had been taking care of them." We fail to find anything in the will that is inconsistent with the testatrix' aims, obligations or affections during the latter part of her life. The only evidence to the contrary was her letter to contestant, referred to in the latter's pleadings as a "will" predating the will in question about two years, in which it was said:

> "If I do not make a will later, this is one for you, my only bodily heir, to have all of my property, both personal and real."

During the almost two years which elapsed after this letter was written, many things, including contestant's marriage and departure from home and testatrix' more complete reliance on proponent for personal care, as well as management of her property, intervened to cause a plausible and natural change in her plans for the testamentary disposition of her modest estate. In the case of In re Cook's Estate, 71 Okl. 94, 175 P. 507, this court held:

> "Undue influence, such as will invalidate a will, must be something which destroys the free agency of the testator at the time when the instru-

ment is made, and which, in effect, substitutes the will of another for that of the testator. It is not sufficient that the testator was influenced by the beneficiaries in the ordinary affairs of life, or that he was surrounded by them and in confidential relations with them at the time of its execution."

In McClure v. Kerchner, 107 Okl. 28, 229 P. 589, 594, this Court in following the above principle quoted from Schouler on Wills, (6th Ed.) Vol. 1, Sec. 276, as follows:

> "Influence based on affection for members of a family is not undue influence, as such influence is natural and proper and in a different class from that which a stranger may obtain."

After carefully reviewing the evidence, we are thoroughly convinced that the rules applied in Anderson v. Davis, supra, do not apply here and that in this case, the circumstances are insufficient to create a presumption of undue influence on the part of the proponent. Contestant had the burden of proof on this issue throughout the trial and our examination of the record impels us to concur with the trial court's view that she failed to discharge this burden.

As to the decedent's testamentary capacity, the only medical evidence upon which contestant has to rely is the deposition of a Dr. Margo, an associate of the McBride Clinic in Oklahoma City, where testatrix was hospitalized for one week in July, 1944, and the testimony of a Dr. Talley of Marlow who attended her for a rectal disorder about two months after her will was executed and just a few days before she died. No one appeared to cross-examine Dr. Margo when his deposition was taken and it does not appear what his medical specialty, if any, was. When asked if testatrix was coherent and sensible in her conversation when he saw her, he stated: "She was irregular." It further appears that he advised her to go to a psychiatrist. Dr. Talley did not qualify as a psychiatrist, but his testimony was to the effect that the testatrix was mentally unstable and incompetent at the time he saw her. On the basis of the history he said

she related, he expressed the opinion that such mental condition must have existed many months before. Dr. Talley had no clinical records on the testatrix' case and could not fully or in detail repeat the history she gave him. A controlling factor in the formation of his conclusion seems to have been testatrix' belief that there was something physically wrong with her. When he could find nothing, he thereupon concluded that her trouble was all mental. As counsel points out, however, the fact that the testatrix died about ten days after Dr. Talley attended her is some indication that her disability was not entirely mental. The only other witnesses who cast any doubt whatsoever upon the testatrix' mental capacity were a Mrs. Ward who testified that sometimes she did not talk rationally when having "suffering spells"; a Mrs. Duncan who said she wouldn't call the testatrix rational; and Mr. Flippen, who was an administrator of the estate and testified that he could not be positive that the testatrix was always rational, but gave an affirmative answer to counsel's inquiry as to whether the testatrix appeared to be rational, capable of reasoning, and attending to her business during the year 1944. None of these witnesses testified that at the particular time she executed the will, the decedent lacked testamentary capacity. All acknowledged that ordinarily she was a person with a keen mind, a strong will, and could not be easily influenced. Others testifying on this subject were a Duncan physician who indicated that the testatrix was merely a neurotic, the three witnesses to the execution of the will, a bank president, and an abstracter and his wife who had known and done business with the testator for a number of years. The witnesses to the will testified that the testatrix appeared rational when she executed it and two of them were her tenants who, because of their close and frequent association with her, had excellent opportunity to observe and adjudge her mental condition. The banker testified that he talked to the testatrix frequently about business matters during the year 1944; and that she was a very capable and intelligent person. The abstracter and his wife saw the testatrix in her home soon after she executed the will when she delivered it to them for safe keeping in their office vault until her death. They both testified that she appeared to have a clear mind and was a forceful and capable person. Though it is undisputed that at the time the testatrix executed the will in question, she was ill and in a weakened condition this is not proof in itself of her testamentary incapacity. As said in the case of In re Shipman's Estate, 184 Okl. 56, 85 P.2d 317, in order to constitute such proof, said condition must be shown to have rendered the testatrix incapable of understanding the nature and consequences of her acts at the time she made the will. In formulating his findings of fact and conclusions of law that the testatrix was competent and of sound mind at the time she executed the will in question, the trial judge stated:

"There is testimony in this case that Mrs. Martin was a neurotic during the latter part of her life. The evidence fails to show any irrational thing that she ever did that I recall in this testimony.

"I further find that she was above the average in intelligence and mental stamina, and was alert and was the type person that would not be easily persuaded by anybody, and especially so in connection with her daughter, and that she believed that her daughter was not such a person that could adequately take care of her own business affairs. That she might be more easily overreached than the ordinary person her age, and believing that, she felt that she must place this property in the hands of some one wherein the interest would better benefit and assist her daughter."

From our review of the evidence and in view of the principles of law properly applicable thereto, we cannot say that the trial court's conclusions on the issues presented herein are clearly against the weight of the evidence. See Amos v. Fish, 193 Okl. 406, 144 P.2d 967. Accordingly, that judgment is affirmed.

610

HALLEY, C. J., JOHNSON, V. C. J., and CORN and WILLIAMS, JJ., concur.

WELCH and ARNOLD, JJ., concur in conclusion.

O'NEAL, J., dissents.