269 P.2d 349 (1954)
In re FLETCHER'S ESTATE.
SIMLER
v.
WILSON et al.
No. 36075.
Supreme Court of Oklahoma.
March 30, 1954.
*350 Leslie L. Conner, James E. Grigsby, Arnold B. Britton, Phil E. Daugherty, Charles W. Conner, Oklahoma City, for plaintiff in error,
Fred E. Suits, Suites & Weiss, Oklahoma City, for defendants in error.
O'NEAL, Justice.
This is an appeal from the District Court of Oklahoma County, Oklahoma, affirming the action of the County Court of Oklahoma County, Oklahoma, in admitting to probate the last will and testament of Birdine Fletcher, deceased.
Birdine Fletcher died, testate, on July 13, 1952, at the age of 78 years. She had executed her last will and testament on July 9, 1952. The scrivener, through a a typographical error, inserted the date as of June 9, 1952 in the attestation clause for the signature of the witnesses. The will discloses it bears the genuine signature of Birdine Fletcher, and bears the signatures of three subscribing witnesses.
Over the objections of A.J. Simler, brother of the deceased, the will was admitted to probate by an order of the County *351 Court of Oklahoma County, Oklahoma, entered as of October 2, 1952. An appeal was taken by the contestant, A.J. Simler, to the District Court of Oklahoma County, where, upon a trial de novo, that court, under date of January 27, 1953, entered its order and judgment that the instrument offered for probate as the last will and testament of Birdine Fletcher, deceased, be admitted to probate, and that the order and judgment of the County Court entered on the 2nd day of October 1952, admitting the will to probate be affirmed, and that the contest to the probate of the will be denied.
The contestant, A.J. Simler, has brought the case here for review. Two questions are presented by the record; namely;
First. Was Mrs. Fletcher competent in a legal sense to execute the will?
Second. Did the principal beneficiaries under the will secure its execution by exercising undue influence upon the testatrix?
We are aided in our determination of these questions by the rules of law frequently announced in our former decisions. Runnels v. Burton, 202 Okl. 406, 214 P.2d 709; In re Heitholt's Estate; State v. Duerksen, 202 Okl. 351, 213 P.2d 865; and In re Williams' Estate (Williams v. Gibson), 207 Okl. 209, 249 P.2d 94.
In the foregoing cases the rule is announced as follows:
"The judgment of the trial court admitting a will to probate will not be disturbed by this court on appeal unless such judgment is clearly against the weight of the evidence."
In King v. Gibson, 207 Okl. 251, 249 P.2d 84, 87, we held:
"A person has testamentary capacity when his mind and memory are such that he knows, in a general way, the character and extent of his property, understands his relationship to the objects of his bounty and to those who ought to be in his mind on the occasion of making a will, and comprehends the nature and effect of the testamentary act."
In Brummett v. King, 207 Okl. 607, 251 P.2d 1062, 1063, we held:
"Testamentary capacity, or the lack thereof, is a question of fact. There is no rule by which it may be determined, with precision, where capacity ends and incapacity begins, but this question should be determined from all the facts and circumstances of each particular case."
In re Martin's Estate (Hammond v. Frensley), Okl.Sup., 261 P.2d 603, 604, we held:
"The undue influence necessary to invalidate a will is that which, in effect, substitutes the will of others or another for the will of the testator."
In re Cook's Estate (Cook v. Cook), 71 Okl. 94, 175 P. 507, 509, the rule is announced as follows:
"Undue influence, such as will invalidate a will, must be something which destroys the free agency of the testator at the time when the instrument is made, and which, in effect, substitutes the will of another for that of the testator. It is not sufficient that the testator was influenced by the beneficiaries in the ordinary affairs of life, or that he was surrounded by them and in confidential relations with them at the time of its execution."
The record of the case before us is voluminous containing the testimony of approximately sixty witnesses testifying in the trial court extending over a period of nine days, as well as the record of approximately eight hundred exhibits. The case was well tried by counsel for the respective parties.
Contestant Simler makes the contention that the will of Mrs. Fletcher, his sister, was prepared by Sister Mary Francis Eugene at St. Anthony's Hospital in Oklahoma City; that said hospital is a beneficiary under the will and, therefore, under the rule announced in Anderson v. Davis, 208 Okl. 477, 256 P.2d 1099, the proponent failed to meet the burden of proof required to sustain the factum of the will.
The Anderson case, supra, holds that when a will is drawn by a beneficiary *352 who is confidential relation with testatrix, a presumption of undue influence arises. The premise assumed by the contestant is not supported by this record. Sister Mary Francis Eugene did not prepare the will in question, neither is she a beneficiary under the terms of the will.
On July 9, 1952, Mrs. Fletcher went to St. Anthony's Hospital and requested this Sister of recopy her will dated June 12, 1951, which will had previously been prepared at her request by J.B. Dudley, an attorney of Oklahoma City.
In paragraph 1 of the former will referred to, Mrs. Fletcher requested that paragraph 1 be amended by adding the following words; "and the sums hereinafter mentioned and set out for Mass offerings."
Paragraph 2 of her present will should read as follows:
"I will and direct the payment of $1600.00 as Mass Offerings to be distributed to the following: To His Excellency, Bishop Eugene J. McGuinness, Bishop of Oklahoma City and Tulsa, and/or his successor in office, the sum of $1,000.00, to be distributed by him as he deems best: To the Carmelite Fathers, 1125, South Walker, the sum of $100.00 for three (3) set of Gregorian Masses and ten other Masses; to Father James H. Ross, Oklahoma City, Oklahoma, $200.00; Carmelite Fathers, Marylake Novitiate, Hinsley, Arkansas, $100.00 and ask that three set of Gregorian Masses and 10 others, be said immediately; to Msgr. Gilbert Hardesty, $100.00. It is my wish and I so direct immediate payment of the above."
Paragraph 3 of the will of June 12, 1951, as prepared by Mr. Dudley, read as follows:
"I will and bequeath to my brother, A.J. Simler of Little Rock, Arkansas, the sum of One ($1.00) Dollar."
Mrs. Fletcher requested the Sister who was doing the typing of the will to add the following words: "this amount and no more."
With reference to paragraph 21 of her former will she requested the Sister to add the following words: "and Fred E. Suits, Attorney, of Oklahoma City, Oklahoma, (my present personal attorney) as attorney to probate my will and represent my Executor W.H. Wilson, in the administration of my estate."
Paragraph 22 of the present will was not contained in the former will. Paragraph 22 reads:
"Whoever contests this will shall forfeit all bequeaths and benefits mentioned herein, of every kind and character."
Except for the quoted changes above enumerated and omission of a provision contained in the former will for a $500 legacy to a friend, the will of July 9, 1952 and the will of June 12, 1951, prepared by Judge Dudley for Mrs. Fletcher, are identical, save and except the names of the attorney witnesses to the two instruments. Furthermore, the Sister who typed the will at Mrs. Fletcher request, did not know the nature of the typing requested by Mrs. Fletcher until the so-called "Dudley Will" was given to her for recopying. After the will was retyped, Mrs. Fletcher requested that certain employees of St. Anthony's Hospital be called to witness her will. Only one of the witness requested by her was available, so Sister Eugene called others to witness Mrs. Fletcher's signature. After their appearance Mrs. Fletcher signed the will and requested the three persons appearing to sign their names as attesting witnesses.
We are unable to find any testimony supporting contestant's assertion that Sister Mary Francis Eugene made any suggestion in the changes made by Mrs. Fletcher in the present will.
Contestant arrests that the testatrix was incompletely by reason of her age and physical and mental condition to execute a valid will.
The applicable rule is that in a will contest, where due execution and attestation are established, a presumption of testamentary capacity arises, and the burden of proving unsoundness of mind of the testatrix is upon the contestant. See In re Martin's Estate, supra.
*353 In re Baker's Will, 207 Okl. 158, 248 P.2d 627, 632, we held:
"A testator has a sound mind of testamentary purposes when he can understand and carry in mind, in a general way the nature and situation of his property and his relation to those who naturally have some claim to his remembrance, and to those in whom, and the things in which, he has been chiefly interested. Mere showing that at time of execution his memory was bad, and that he was physically weak, unaided by other evidence is insufficient to establish lack of testamentary capacity."
In re Lamar Estate (Bray v. Leeper), 206 Okl. 244, 242 P.2d 727, 728, we said:
"The testamentary capacity of a testator must be determined as of the time of the making and execution of the will. In determining that question, prior and subsequent acts have bearing only to the extent of assisting in determining the mental status of the testator at the time of the execution of the will.
As the pivotal question raised by contestant is the mental competency of the testatrix to execute the will, we narrate evidence of probative value of the proponents and the contestant on that issue.
John Fletcher and Birdine Fletcher, husband and wife, formerly lived on a farm near Anadarko, Oklahoma; they leased their land for oil and gas for a bonus of $16,000; oil development followed resulting in the acquisition of an estate valued at approximately one-half million dollars. For more than twenty years the Fletchers have resided in Oklahoma City. John Fletcher died at the age of 91 years in February, 1951. His wife died in July, 1952.
The evidence disclosed that during the last five years of life Mrs. Fletcher suffered from physical impairment necessitating the services of several physicians, as well as hospitalization. On one occasion she had shingles and her physician prescribed barbiturates for relief of pain. On another occasion she suffered with paroxysmal tachycardia, commonly known as "rapid heart beat" necessitating hospitalization, at which time her physician gave her several prescriptions for nembutal and nucidin to be administered to her by her nurse. On another occasion Mrs. Fletcher had a fall in her home resulting in a head injury and unconsciousness, and she was ordered by her physician to the hospital for treatment. On this occasion her physician prescribed codine to relieve her restless condition.
The record discloses that several physicians treated Mrs. Fletcher at her home, as well as St. Anthony's Hospital, covering a period of several years prior to her death. Although the contestant asserts that his sister was a narcotic addict, and proof does not support the assertion. Her physicians' testimony supports a conclusion that the barbiturates prescribed by them and taken by Mrs. Fletcher were no habit forming and that drugs in the narcotic classification were only prescribed for her treatment when deemed necessary by them for relief of a specific aliment. Although the record is replete by contestant's reference of "red birds," "yellow jackets," "white pills," "brown pills" and dark and green liquid medicines, there is no evidence in the record that any medicine taken by Mrs. Fletcher had not been prescribed by a duly licensed and practicing physician, either in the general practice or connected as a staff member of St. Anthony's Hospital.
During these years the Fletchers occupied a residence on West 47th Street in Oklahoma City. According to the evidence of practical nurses and maids employed in the home, as well as the neighbors, she maintained a neat and clean house, frequently helping with the preparation of meals and performed her household duties. She was active in maintaining a flower garden, spending many hours in its cultivation and case. As to her personal care the evidence discloses that she kept herself scrupulously clean the neat.
The contestant, Simler, and his wife, who had resided in Little Rock, Arkansas for years, came to visit the Fletchers in February, 1950, and moved into the Fletcher home in March, 1950, and remained there *354 until October of that year. It was during this period of time that Simler contends that his sister used barbiturates and other drugs to excess resulting in her physical and mental incapacity to execute the will in question.
During their occupancy of the Fletcher home, the Simlers were paid various sums by Mrs. Fletcher for their services. In addition to these payments she gave Simler and one of his sons $500 each, both of these payments begin made by check. Two families living in a medium sized five room house resulted in inevitable family differences and conflicts, which culminated in a request by Mrs. Fletcher that the Simlers leave her home. A few days later Simlers filed a petition in the County Court of Oklahoma County to declare his sister an incompetent person. The following day he withdrew that petition, but few days thereafter filed a second petition to have her placed under guardianship. The County Court on October 20, 1950, entered an order declaring Mrs. Fletcher an incompetent person and appointed a guardian of her person as well as her property.
In March, 1951, she filed her petition for restoration of competency, and on the 20th day of April, 1951, an order was made by the Judge of the County Court restoring her to competency.
John Fletcher, her husband, had died in February of that year and upon Mrs. Fletcher's application she was appointed administratrix of John Fletcher's estate; that estate was duly administered and Mrs. Fletcher, as the sole surviving heir, was declared to be the beneficiary thereunder.
It is quite obvious from the record that her services as administratrix of her husband's estate discloses an unusual mentality for a person in her station of life considering her advancing years. During these years, as disclosed by the testimony and as evidenced by hundreds of exhibits in the record, consummated many business transactions requiring the issuing of many hundred checks. In almost every instance these checks were prepared entirely by her.
In June, 1951, Mrs. Fletcher went to the officer of J.B. Dudley, an attorney in Oklahoma City, and requested him to draw up her will, She advised him that her husband had recently died an that his estate was in the process of administration and was about to be closed. She advised him that she had been declared an incompetent person on the application of her brother, but that upon a further hearing she had been restored to competency. She advised him generally as to the nature of her property and certain bequests she desired to make. Mr. Dudley suggested that she reduce to writing the names of those to whom she desired to make such bequests. She returned to his officer the following day with a list of names which she had prepared in her own handwriting. After Dudley prepared a portion of the will he advised her that some disposition should be made of the residue of her estate. She told him she wanted the residue to go to St. Anthony's Hospital at Oklahoma City, and the two other Catholic institutions named in her will. After the will was drafted she signed the same and it was witnessed in due form.
In her several trips to Dudley's officer she spoke of the fact that her brother had put her under guardianship which had resulted in great expense and announce to her, and that she expressed resentment against him for having done so, and that therefore she wanted to limit her bequest to him in the sum of $1. Dudley testimony is to the effect that she visited his officer three or four times and that he formed the opinion that she entertained a fixed notion as to the disposition of her property, and that she was a competent person at the time of the execution of that will.
Subsequent to her restoration of competency and on September 27, 1951, Mrs. Fletcher requested a loan of $15,000 from the First National Bank and Trust Company of Oklahoma City, Oklahoma. An officer of that bank testified that he requested she furnish the bank with a financial statement, which she did. The loan was made for $15,500 open, that is, without security. She paid $10,000 on the loan in December, 1951 and $5,500 in February, *355 1952, thus retiring the indebtedness prior to its maturity. The process of this loan were used by her in paying off her indebtedness in the sum of $15,000 to the Fidelity National Bank of Oklahoma City.
In March, 1951, Mrs. Fletcher entered into a contract with Todd Ferguson, an authorized real estate agent, to sell certain property owned by her on N.W. 47th Street in Oklahoma City. This property was told by her agent for the sum of $7,500. In closing that transaction she declined to sing the deed until her attorney had reviewed the transaction, and advised her that the purchaser had performed the terms of the written contract with reference to the sale of the property.
In February, 1952, Mrs. Fletcher bought new furniture for her home; she examined certain household furniture then in a wholesale house. Afterwards she accompanied the retain salesman to her home where they negotiated for a price for her old furniture which was to be taken in as part payment on the new. In that transaction she issued two checks, Exhibits 0-698 and 0-699, which checks disclosed a clear legible handwriting and signature.
A geologist and oil operator had known Mrs. Fletcher since 1948. After her restoration to competency she phoned him requesting that when convenient to him to please call her home as she was contemplating selling all or part of her oil royalty holdings in Caddo County, Oklahoma. He called upon her during the summer months fifteen to twenty times during the year 1951, and several times in the fall of that year. Mrs. Fletcher suggested a selling price of $150,000 for her royalty interest. The geologist made a counter proposition of $100,000. They were unable to agree upon terms and therefore the sale was not consummated. During one of these meetings she expressed the wish to sell her oil properties because so many people were pressing her for assistance in various forms. The geologist testified: "* * * there is no question in my mind that one who has handled through the details and I saw she was handling her estate, and what she was doing with it, there is no question in mind but what she was competent."
In August, 1951, Mrs. Fletcher loaned $30,507.24 to Katherine F. and B.F. Watkins, with which to purchase a grocery store. The Watkins in that transaction were represented by an attorney, both in negotiating and closing the loan transaction.
Contestant Simler's evidence largely covers a period of time prior to the guardianship proceedings of October, 1950. After those proceedings were filed he went back to Little Rock, but returned to Oklahoma City in February, 1951, to attend the funeral of John Fletcher, and also to attend the hearing of March, 1951, in the County Court upon his sister's application for restoration to competency. He saw his sister at St. Anthony's Hospital in May, 1952.
Two psychiatrists were called by the contestant to express an opinion as to the competency of Mrs. Fletcher to make a testamentary disposition of her property. One psychiatrist testified that he was requested by the County Judge of Oklahoma City to observe Mrs. Fletcher during the hearing on Simler's application to have her declared an incompetent. Upon a stated hypothetical question, based upon Mrs. Fletcher's medical history as a patient at St. Anthony's Hospital covering a period from 1948 to 1952, together with the testimony of various witnesses as to her conduct in the home, including alleged conversations with her brother and others, he gave it as his opinion that a woman of her age, who had suffered these changes as represented by her various diagnoses between 1948 and 1952, would be an unstable and easily unbalanced person.
Upon cross-examination in answer to a hypothetical question, based upon Mrs. Fletcher's services as the administratrix of her husband's estate, the various business transactions delineated by the witnesses and the circumstances surrounding the making of her will in July, 1952, the witness expressed the opinion that:
"I think I will state this: that it would be an indication that she certainly did not appear to be grossly incompetent *356 to bankers and others who are judges of character, as well as collateral, that would be presumptive evidence of competency."
Again delineating the circumstances of Mrs. Fletcher's appearance on July 9, 1952, based upon her request to Sister Eugene to have her will retyped, and suggesting the additions as indicated, and certain deletions from a will prepared for her in June, 1951, the witness testified: "Well, it would show certain evidence of conscious awareness of the facts."
The other psychiatrist expressed an opinion based upon a hypothetical question substantially embracing the evidence submitted by the contestant, that the picture thus presenters an unstable condition of other patient, and which indicates a type of personality one often finds in an addition. He then states: "Now, this would not necessarily make her an irresponsible person."
Upon cross-examination, based upon a hypothetical question embracing substantially the testimony as delineated by proponent's witness with reference to the various transactions had by them with Mrs. Fletcher, including the testimony with reference to the execution of the will prepared by Judge Dudley for her, the psychiatrist expressed the opinion that in June, 1951, she was a competent person. He further expressed a like opinion as to her competency as of July 9, 1952, when the present will was executed.
A review of the testimony does not in our opinion support the contestant's position that the Sisters of St. Anthony's Hospital or any of its representatives or employees in any manner exercised any undue influence upon Mr. Fletcher inducing her to make the bequests contained in her will. It is true that a friendly relationship existed between Mrs. Fletcher and Sisters Agnes and Eugene, and perhaps with other employees at the hospital; that was a natural relationship arising out of their common religious faith, and which was augmented by the fact that Mrs. Fletcher frequently worshiped in the chapel in the hospital. She had been a patient in the St. Anthony's Hospital on a number of occasions and it was a natural expression of gratitude that she made a present of an electric fan to one Sister and a clock to another. Neither can the circumstances that on several occasions after she attended Mass at the hospital chapel that she was invited by the Sisters to have breakfast with them be construed as of probative value to support contestant's allegation of improper influence.
There is evidence tending to support a finding that Mrs. Fletcher had for some years prior to the execution of her will, made annual donations to Catholic charities. Considering her wealth, these contributions were indeed very moderate and negative the inference that they were not voluntarily made.
John and Birdine Fletcher had no children. As sole heir of her husband's estate she elected to bequeath her property to her friends and to the beneficiaries named in her will.
We are of the view that the conclusions reached by the County Court and affirmed on rehearing by the District Court, that Mrs. Fletcher was a competent person at the time her will was executed is supported by the weight of the evidence. The judgment must therefore under the applicable principles of law, heretofore referred to, be and the same is hereby affirmed.